DECISION AND JUDGMENT
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, entered after defendant-appellant, Ennie Ray McGlown, Jr., was convicted of six counts of rape and one count of gross sexual imposition and sentenced to a total of 36 years incarceration. Appellant now challenges that judgment through the following assignments of error: *Page 2 
 {¶ 2} "I. Defendant's constitutional right of due process was violated by the trial court allowing the Toledo police detective to testify as an expert.
 {¶ 3} "II. The trial court erred in permitting the police detective to testify as it only was presented to bolster the victims' testimony.
 {¶ 4} "III. Defendant's right to a fair trial was violated by prosecutorial misconduct."
 {¶ 5} On November 10, 2005, appellant was indicted and charged with one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a third degree felony, and six counts of rape in violation of R.C. 2907.02(A)(2), all first degree felonies. The charges were filed after appellant's two stepdaughters, T. J. and A. J., alleged that appellant had been sexually abusing them over a period of years. Appellant pled not guilty to the charges and the case proceeded to a jury trial at which the following evidence was presented.
 {¶ 6} Appellant married the victims' mother, K., in May 2004 after appellant, K., the victims, and other extended family members had lived together for some time. In 2002, the family lived on Austin Street in Toledo, Ohio. A.J., who was born in May 1988, testified that in 2002, sometime after her fourteenth birthday, appellant approached her and asked how she would feel about having sex with him. A.J. testified that when she did not respond appellant continued to ask her. Sometime thereafter, she had fallen asleep on the living room couch. That night, she was awakened by appellant, who took off her pants and inserted his penis into her anus. Appellant also threatened her, warning *Page 3 
that if she told anyone he would harm her little sister, T.J. A.J. testified that after this first incident, appellant sexually assaulted her on a regular basis, forcing her to engage in vaginal intercourse. He also performed oral sex on her.
 {¶ 7} After the family moved to Fulton Street, also in Toledo, in 2003, appellant began forcing appellant to perform fellatio on him. A.J. stated that this first occurred when she was in her freshman year of high school. A.J. testified that all of the incidents occurred in the living room at night. Appellant had bought her a cell phone and would call her in her upstairs bedroom and summon her downstairs or he would use a broom to hit the bathroom ceiling just under A.J.'s bedroom to signal her. Finally, in the summer of 2005, K. left appellant and K., the victims, and M., the victims' brother, moved out of the house on Fulton Street and into a house on Park Street where other members of appellant's family lived. One day in July, while at the house on Park Street, A.J. was watching the Oprah Winfrey show when the topic was rape victims confronting their rapist for the first time. After seeing the show, A.J. realized that she had to tell her mother about the incidents with appellant. Her mother then called the police and A.J. reported her stepfather's actions to Officer Danielle Kasprzak and Detective Regina Lester. Prior to this, A.J. never told anyone about the incidents, although she did describe an incident in which appellant sexually assaulted both her and her younger sister T.J. at the same time.
 {¶ 8} T.J. also testified at the trial below. T.J. was born in May 1991, and testified that appellant first molested her when she was 13 and the family lived on Fulton *Page 4 
Street.[1] T.J. stated that appellant had bought her a cell phone the day after Christmas. A short time thereafter, appellant called her at approximately 2:30 a.m. and told her to come downstairs. When she got to the living room, all of the lights were off. Appellant then told her that because she had been involved in rumors that he had been messing with A.J., he was going to do it to her too to teach her a lesson. He then ordered her to remove her clothes, except for her underwear, and to lie on the floor. Appellant then watched her lying on the floor while he fondled himself. T. J. testified that the next night, again at around 2:30 a.m., appellant called her again on her cell phone and summoned her to the living room. T.J. stated that that night, and many nights thereafter, appellant would force her to kiss his chest and touch his penis while he ejaculated. He also forced her to perform oral sex on him and he would perform oral sex on her. Although appellant tried to have intercourse with T.J., T.J. testified that she always pushed him away. T.J. also stated that on at least two occasions appellant forced her and her sister A.J. to engage in sexual activity with him at the same time. Finally, T.J. testified that on June 13, 2005, after watching the Oprah Winfrey show, she and A.J. told their mother what appellant had been doing to them.
 {¶ 9} Dr. Randall Schlievert, a pediatrician at the University of Toledo, Department of Pediatrics, who directs the office of child abuse for Mercy Health Partners, interviewed and physically examined T.J. and A.J. on July 14, 2005, at St. *Page 5 
Vincent Hospital. Dr. Schlievert testified at the trial below regarding his examination and findings. In addition, his reports regarding those evaluations were admitted into evidence. Dr. Schlievert stated that although neither girl showed physical signs of sexual abuse, the exams were conducted several weeks after the last purported molestations. In this regard, Dr. Schlievert testified that in 95 percent of child sexual abuse cases where the victim has reached puberty, which both of these victims had, the physical exam will show no signs of abuse unless the exam is conducted shortly after the event.
 {¶ 10} The state also called Officer Danielle Kaspsrzak and Detective Regina Lester to testify at the trial below. On June 13, 2005, Officer Kaspsrzak responded to the victims' address on Park Street, after receiving a call of purported sexual abuse. She first spoke with K., the victims' mother, who gave her a brief description of the girls' allegations. Kaspsrzak then separated the two victims so that she could interview them independently. After interviewing the victims, Kaspsrzak completed a report and routed it to the sexual assault division of the Investigation Unit.
 {¶ 11} Detective Regina Lester is assigned to the special victims unit of the Investigation Unit of the Toledo Police Department. At the time of the trial below, she had been in that capacity for six and a half years, investigating 130 to 170 cases of child sexual abuse and/or exploitation a year. Detective Lester stated that she has testified in 10 to 12 trials and that in two of those cases she was declared an expert in child sexual exploitation. She testified that she received this case on June 20, 2005, and that, consistent with her protocol, she first interviewed the victims' mother, K., who had filed *Page 6 
the police report. From K., she obtained background information on the family and learned how the allegations were brought to her attention. She then interviewed A. J. and T.J. separately. Based on the information she learned in the interviews, Detective Lester prepared a report and contacted Lori Olender, a prosecutor who handles all of the child sexual abuse cases in the Lucas County Prosecutor's Office, who presented the case to the Grand Jury.
 {¶ 12} During the state's direct examination of Lester, however, the state attempted to elicit testimony on the subject of delayed disclosure of sexual abuse. Following objection by appellant, the prosecutor asserted that Lester was an expert in child interviews and disclosures made by children in sexual abuse cases. The prosecutor contended that Lester would not be offering any opinions as to the truthfulness of the victims' statements but would testify as to the interview and disclosure process and that disclosures typically come in different forms over time, thereby explaining why there could be differences in a victim's statements over time. The court questioned whether this was a proper subject for expert testimony and ultimately, the state determined that it would not seek to have Lester qualified as an expert. In further arguments before the court, however, the state indicated that it wanted to ask Lester to define delayed disclosure and to explain why someone, particularly a child sexual abuse victim, might delay disclosing the abuse. The court specified that it would not allow Lester's testimony to bolster the credibility of the victims. The direct examination of Lester then continued. After reviewing Lester's education and training, the state then questioned her as follows: *Page 7 
 {¶ 13} "Q. Now, what is delayed disclosure?
 {¶ 14} "A. Delayed disclosure could be two things, a disclosure that an individual doesn't make right away, or a disclosure from a repressed memory case that they initially have no recollection but something jars their memory so again that disclosure is delayed too.
 {¶ 15} "Q. Why might there be delayed disclosure?
 {¶ 16} "MR. GELLER: Objection.
 {¶ 17} "* * *
 {¶ 18} "THE COURT: That will be overruled just as to this specific question and/or issues.
 {¶ 19} "A. Delayed disclosure may occur for various reasons depending on the individual. Looking at children, and I take children from small children through their adolescent years. One could be fear of abandonment, fear of people not believing them, fear of loss of love from the offender. There could be fear of reprisal from other family members. People judging them, fear of not being believed.
 {¶ 20} "And with the judging goes fear that at times with adolescents there could be some consensual acts that are indicated so again fear of not being believed and reprisal and that loss of family and love.
 {¶ 21} "* * *
 {¶ 22} "Q. Yes, sir. Do subsequent — after there is an initial disclosure are there sometimes other disclosures? *Page 8 
 {¶ 23} "A. Yes.
 {¶ 24} "Q. With subsequent disclosures, what is their relationship as to the first disclosure?
 {¶ 25} "MR. GELLER: Object to the nature of the question the way it is asked. It is not clear.
 {¶ 26} "* * *
 {¶ 27} "THE COURT: Okay. Objection will be overruled. Yes.
 {¶ 28} "A. Because something like sex is very private. It isn't something that we talk about to the person sitting next to us everyday whether we know or don't know them. Same thing goes for anyone, whether it be a small child who doesn't realize that it's wrong, to a teenager who is either not comfortable or not familiar with the person they are talking to, that's — I think that is just human nature in itself.
 {¶ 29} "That disclosure could continue or be — I say disclosing is more I guess of a process so to speak that the child feels more comfortable, when they don't — when they have — they don't have fear of reprisal. When they have a strong support system it makes it easier for the child to continue on with what happened.
 {¶ 30} "Also sexual abuse that occurred over a period of time, there is so much involved in that, and it's very difficult for an individual to condense that to a half hour or 45 minute interview. Hence we know that it's as the process continues, the legal process, that the child may remember additional facts that happened or just feel more comfortable in discussing more about what happened to them." *Page 9 
 {¶ 31} Finally, at the trial below, appellant called two witnesses in his defense. His uncle, Arvie McCormick, and his mother, Bonnie McGlown, both testified as to the numerous people that lived with appellant, K. and the victims during the time period when the victims alleged the abuse had taken place. Through this testimony, appellant attempted to establish that because there were so many people living in the house, the abuse could not have happened as the girls reported.
 {¶ 32} At the conclusion of the trial, the jury found appellant guilty of all charges. Subsequently, the court sentenced appellant to three years incarceration on the gross sexual imposition offense and six years each on the rape offenses, with the three year term running concurrently to a rape term and the rape terms running consecutively to each other, for a total sentence of 36 years incarceration. Appellant now challenges his conviction on appeal.
 {¶ 33} In his first assignment of error, appellant asserts that the lower court erred in permitting Detective Lester to testify as an expert witness on the issue of delayed disclosure. Appellant contends that the state never laid a proper foundation to qualify Lester as an expert in delayed disclosure and that the testimony only had the effect of bolstering the victims' testimony. The state counters that Detective Lester was never declared to be an expert witness but that her testimony on the issue of delayed disclosure was admissible under Evid. R. 701.
 {¶ 34} We first note that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court."State v. Sage (1987), 31 Ohio St.3d 173, *Page 10 
paragraph two of the syllabus. This court, therefore, will not reverse a trial court's ruling regarding the admission or exclusion of evidence unless the trial court abused its discretion. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 35} We must first determine if Detective Lester's testimony was lay opinion or expert testimony. Lay witness opinion testimony is "limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Evid. R. 701. In contrast, Evid. R. 702 provides in relevant part that "[a] witness may testify as an expert if all of the following apply:
 {¶ 36} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 37} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 38} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."
 {¶ 39} This court recently addressed the very same issue now raised by appellant in his first assignment of error. In State v. Frost, 6th Dist. Nos. L-06-1142 L-06-1143, 2007-Ohio-3469, we discussed whether Detective Lester was qualified as an expert *Page 11 
witness in child sexual abuse. Although, as appellant points out, the defense in that case stipulated to the detective's qualifications in the area of sexual assault and sexual abuse investigation, we determined that Detective Lester's testimony regarding the issues of re-victimization, conditioning, and delayed reporting in child sexual abuse cases was not plain error. Our determination was based on the fact that the detective possessed a degree of "specialized knowledge" in the area of child sexual abuse based on training and on-the-job experience which included 21 years as a police officer and six years investigating sex offenses. Id. at ¶ 42.
 {¶ 40} Similarly, in State v. Solether, 6th Dist. No. WD-07-053,2008-Ohio-4738, we held that an officer who testified about delayed reporting, and whose testimony was based largely upon his personal experience, was qualified as an expert. We reached this conclusion upon determining that the fact that delayed reporting by sexual assault victims is not uncommon is not within the knowledge of the average juror. Id. at ¶ 65. Accordingly, we found that the officer's testimony required "specialized knowledge" and was properly categorized as expert testimony.
 {¶ 41} A number of other Ohio District Courts of Appeals have also concluded that the manner in which child victims of sexual abuse disclose and report that abuse is beyond the knowledge and experience of lay persons. State v. Bortner, 9th Dist. No. 02CA008189, 2003-Ohio-3508;State v. Carey, 2d Dist. No. 2002-CA-70, 2003-Ohio-2684; State v.Carte (Jan. 14, 1999), 8th Dist. No. 72955; State v. James (Aug. 24, 1995), 3d Dist. No. 6-94-18. *Page 12 
 {¶ 42} A review of the record discloses that Detective Lester was qualified as an expert by specialized knowledge, skill, experience, training, and education regarding child sexual abuse and that her testimony regarding delayed disclosure of abuse was based on that specialized information.
 {¶ 43} Accordingly, although the lower court did not expressly determine that Detective Lester was an expert in child sexual abuse, we cannot say that the lower court abused its discretion in allowing Lester to testify as an expert witness on delayed disclosure and the reasons for it. In so holding, we note that Detective Lester only defined delayed disclosure for the jury and explained why a victim might delay in disclosing the abuse. She did not express an opinion as to whether the two victims in this case had been subjected to such abuse. The first assignment of error is not well-taken.
 {¶ 44} In his second assignment of error, appellant asserts that the lower court further abused its discretion in allowing Detective Lester to testify because her testimony only served to improperly bolster the testimony of the victims. Appellant cites to the portion of Lester's testimony that we have quoted above in support of his argument.
 {¶ 45} In State v. Boston (1989), 46 Ohio St.3d 108, modified on other grounds by State v. Dever (1992), 64 Ohio St.3d 401, the Supreme Court of Ohio held that in cases involving alleged child abuse, "the use of expert testimony is perfectly proper and such experts are not limited just to persons with scientific or technical knowledge but also includeother persons with `specialized knowledge' gained through experience,training or education." Id. at 126. (Emphasis added.) The expert witness, however, "may not *Page 13 
testify as to the expert's opinion of the veracity of the statements of a child declarant." Id. at syllabus.
 {¶ 46} At the trial below, Lester testified about investigation protocols, the investigation of this case in general, and the statements quoted above. Lester did not opine as to whether she believed the victims were telling the truth. She simply testified in general about delayed disclosure. That testimony did not improperly bolster the victims' credibility. See State v. Moore (Feb. 7, 2001), 9th Dist. No. 00CA007587; State v. Demiduk (June 24, 1998), 7th Dist. No. 96-C0-16;State v. Ritchie (Apr. 2, 1997), 9th Dist. No. 95CA006211. The second assignment of error is not well-taken.
 {¶ 47} Finally, in his third assignment of error, appellant contends that his right to a fair trial was violated when the prosecutor made an improper comment about one of the victims during his closing argument.
 {¶ 48} The comment to which appellant refers was as follows: "Oh, Mr. Geller points out to you that A[.] was depressed. If you had been raped for three years would you be depressed? I would be depressed." Appellant's counsel objected to the statement and the court sustained the objection.
 {¶ 49} Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprived the defendant of a fair trial.State v. Loza (1994), 71 Ohio St.3d 61, 78, overruled on other grounds. "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of *Page 14 
the accused." State v. Eley (1996), 77 Ohio St.3d 174, 187, overruled on other grounds; State v. Lott (1990), 51 Ohio St.3d 160.
 {¶ 50} Prosecutors generally are entitled to considerable latitude in opening statement and closing arguments. State v. Ballew (1996),76 Ohio St.3d 244, 255. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what inferences can be drawn therefrom." State v. Richey (1992), 64 Ohio St.3d 353, 362, overruled on other grounds; State v. McGuire (1997), 80 Ohio St.3d 390, 402-404. Prosecutors may not, however, invade the realm of the jury by rendering their personal beliefs regarding guilt and credibility, or alluding to matters outside of the record. State v. Smith (1984), 14 Ohio St.3d 13,14. Nevertheless, since isolated instances of prosecutorial misconduct are usually harmless, any alleged misconduct in the closing argument must be viewed within the context of the entire trial to determine if any prejudice has occurred. See Ballew, supra at 255; State v.Lorraine (1993), 66 Ohio St.3d 414, 420. To determine if the alleged misconduct resulted in prejudice, an appellate court should consider the following factors: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." State v. Braxton (1995), 102 Ohio App.3d 28, 41.
 {¶ 51} While we recognize that the prosecutor improperly expressed his personal beliefs regarding guilt and credibility through the comment at issue, we cannot say, upon reviewing the prosecutor's closing argument as a whole, that appellant's right to a fair trial *Page 15 
was prejudicially affected. Appellant's trial counsel promptly objected to the comment and the trial court sustained the objection. Moreover, the evidence against appellant, through the testimony of the two victims, was compelling. The third assignment of error is not well-taken.
 {¶ 52} On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Mark L. Pietrykowski J., Arlene Singer, J., Thomas J. Osowik, J., CONCUR.
[1] Although T.J. testified that she was 13 years old when appellant first molested her, other evidence submitted at the trial below indicates that the first incident occurred before T.J.'s thirteenth birthday. *Page 1