[Cite as *State v. Akers*, 2018-Ohio-5201.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-17-1110

      Appellee                            Trial Court No. CR0201401852

v.

Adam L. Akers                              **DECISION AND JUDGMENT**

      Appellant                           Decided:  December 21, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

**Introduction**

{¶ 1} A jury convicted appellant, Adam Akers, of murder and felonious assault, following the death of an elderly woman in the woman's home, which she shared with appellant.  On appeal, appellant argues that the convictions were against the manifest

weight of the evidence and that misconduct by the prosecutor during closing arguments deprived him of a fair trial. Appellant also argues, and the state concedes, that the murder and felonious assault convictions are allied offenses of similar import, which merge for purposes of sentencing. As set forth below, we vacate the eight-year prison term for the felonious assault conviction. The decision of the Lucas County Court of Common Pleas is affirmed in all other respects.

**Facts and Procedural History**

{¶ 2} In October of 2013, "J.U.," the 71-year-old victim in this case, moved in with her daughter, Connie, who lived in a three-bedroom mobile home in Toledo, Ohio, with her boyfriend, William.

{¶ 3} A few months after J.U. moved in, Connie died, and J.U. inherited the mobile home. J.U. allowed William to remain living there and also allowed his son, Adam Akers (hereinafter "appellant"), to move in.

{¶ 4} J.U.'s other daughter, Bonnie, routinely checked on her mother. According to Bonnie, J.U.'s health was poor, and she was mostly bedridden. Although the mobile home had three bedrooms, J.U. slept in a hospital bed in the living room. Bonnie visited her mother's home two to three times per week and hired others to help J.U. with meals, cleaning, and personal hygiene. According to Bonnie, J.U. had $400 in cash stashed away in a leather purse, which she kept under her bed. Bonnie described her own relationship with Akers as poor, and she told him "don't ever raise your voice to my mom [because] this is her home."

2.

{¶ 5} J.U.'s homicide occurred on May 14, 2014. At 8:49 p.m., appellant called 911, and the call was played for the jury. Appellant can be heard slowly and deliberately stating his name and address and then explaining that he lives with his father and a woman named J.U. Thirty-nine seconds into the conversation, appellant stated that "it appears she's been stabbed several times." Akers said that he had "just [come] home from a walk * * * about ten minutes" before placing the call. He added that "the only reason I'm not upset is because she's no relation to me." The 911 operator asked if he could provide J.U. medical assistance until EMS arrived. Akers refused and said he "didn't want anything to do with this." The 911 operator suggested that Akers wait outside until the authorities arrived.

{¶ 6} Deputy Sheriff Douglas Hipp responded to the 911 call. Hipp testified that, when entering the mobile home, the space was "kind of wide open, so you couldn't miss [J.U.'s body]" which was on the floor, six to eight feet from the front door. Blood was seen underneath her body, but blood splatter was not present on the bed, walls or surrounding area. Hipp testified that crime scenes involving stabbings are not typically "covered in blood." The mobile home showed no signs of forced entry, and various items of value—including a television, J.U.'s purse with money in it, and a gold ring—remained in the home. There were signs of a struggle, however, including a table that was knocked over near J.U.'s bed.

{¶ 7} BCI Special Agent Hammond collected evidence at the scene. Hammond testified that he observed "a butter knife [and] a towel and a paper that had bloodstains on

3.

it." Using tetramethylbenzidine ("TMB"), Hammond tested the butter knife and a pair of scissors that were found near the victim's head. Both items tested positive for blood.

{¶ 8} In the kitchen, an orange-handled knife was recovered from a butcher block. Hammond observed that the blade had "a couple of small specks of red-brown staining" that appeared to be blood. Because the suspected blood sample was so small, Hammond did not test it so as to avoid "consuming" the entire sample. Instead, he packaged up the knife so that it could be tested later for blood and touch DNA.

{¶ 9} Hammond also found evidence of blood in the kitchen with the use of a chemical called "Bluestar" which, when applied to blood, will cause the area to "luminesce" or light up in blue. Hammond testified that Bluestar is particularly useful when looking for "blood that's been cleaned up or altered." Here, three areas indicated the "potential" of blood: the corner of the kitchen sink, the corner of the drying rack next to the sink, and part of the kitchen floor that was below the sink and knife block.

{¶ 10} After the kitchen, Hammond inspected the bedrooms. In appellant's bedroom, Hammond observed what he thought was a single glove, turned inside out, on the bed. It appeared to be bloodstained, which Hammond confirmed at the scene with TMB. He packaged the glove for testing. Later, it was determined that the "glove" recovered from appellant's bed was actually two plastic gloves, with one glove inside the other. A third glove was recovered from appellant's bedroom floor, but it did not appear to have blood on it. The third glove was not tested.

4.

{¶ 11} Detective Jeffrey Kozak was the lead investigator on the case and testified at trial. Detective Kozak spoke with appellant in his squad car at the scene. Appellant told Detective Kozak that he found J.U.'s body in the mobile home after taking "a walk for about five hours." Detective Kozak "stopped" appellant from talking any further until Detective Kozak had advised him of his *Miranda* rights because appellant's story "was not making any sense." Detective Kozak took appellant to a police substation, where he handed over his shoes and his clothing. Kozak observed that appellant's clothes and shoes were dry, despite the rainy night and appellant's alleged five-hour walk. Kozak also observed that one of appellant's shoes had a "reddish-brownish substance [on it] that appeared to be blood."

{¶ 12} Later that evening, now May 15, 2014, Detective Kozak and Detective Patrick LaPlante interviewed appellant at the sheriff's office. The videotaped interview was played for the jury. A summary of that interview follows.

{¶ 13} Appellant said that he lived in the mobile home with J.U. and his father, William, and that J.U. gave him money "here and there" for "helping her." On the day of J.U.'s death, appellant left the mobile home about 3:30 p.m. to go for a walk. Appellant walked for hours, as was his custom, and returned to the mobile home after dark. He proceeded directly to his room and spent about ten minutes there, listening to music and drinking. When he exited his room, he saw J.U. lying on the floor. Appellant told the detective that he noticed some "spots of blood" on her rib cage, but he did not know how she had been injured. During the interview, the detectives confronted appellant with his

5.

statement to the 911 operator—that it appeared J.U. had been stabbed several times. Appellant offered no explanation.

{¶ 14} Appellant explained to the detectives that he did not render aid to J.U. because he did not want to "incriminate" himself, and he insisted that he had not touched J.U. after discovering her on the floor.

{¶ 15} Appellant knew J.U. stored cash in an envelope near her bed, but he denied that he ever stole from her. Appellant also denied using the plastic gloves. He speculated that his father may have used the gloves to perform enemas for J.U.'s daughter, Connie.

{¶ 16} At the conclusion of the first interview, the following exchange took place between appellant and Detective Kozak:

> Det. Kozak: Well, hey, you say you didn't do it.
>
> Appellant: And right now that stands.
>
> Det. Kozak: Right now it stands? Okay. All right. So you're saying right now it could change?
>
> Appellant: True.

{¶ 17} Appellant was not placed under arrest, and was free to go after the interview. Later that day, however, a warrant was issued for appellant's arrest. Detective Kozak found appellant at his brother's house and arrested him without incident. Appellant agreed to a second interview, during which he continued to deny killing J.U. The video was also played for the jury.

6.

**{¶ 18}** The kitchen knife, the pair of plastic gloves that were recovered from appellant's bed, and appellant's right shoe and tee shirt were submitted for DNA analysis. Swabs from these items were then compared to the samples taken from appellant, J.U., and William. The handle of the kitchen knife contained the DNA of both William and appellant. A swab of the stain on the blade included a mixture of DNA, and neither appellant, William, nor J.U. could be excluded from that mixture. Testing of the two plastic gloves, which were found one inside the other, revealed the presence of J.U.'s blood DNA on the inner glove and appellant's DNA on the outer glove. Swabs of a blood stain from Akers' right shoe matched J.U.'s DNA. The parties agreed that the results of DNA testing of appellant's tee-shirt would not be introduced at trial.

**{¶ 19}** According to the coroner, who testified at trial, J.U. suffered 14 knife wounds, eight of which occurred while J.U. was still living. The coroner distinguished "stab wounds," which are deep from "cut wounds," which are wide. All of J.U.'s wounds were stab wounds, except one. The coroner opined that the victim's cut wound was a "classic [] defense wound" based upon its location: the victim's ulna, which is a bone in the forearm. According to the coroner, "it's not unusual when a person is being attacked that they put up their arms, or they try and push the assailant away [which] expose[s] the ulna." The coroner added that the knife struck the victim's ulna with such force that it caused a spiral fracture. The coroner observed no other defensive wounds.

**{¶ 20}** The coroner performed a "fit test" of the knife recovered from J.U.'s kitchen, and she opined that J.U.'s injuries were "consistent with" the knife, but she could

7.

not be certain that the kitchen knife had inflicted J.U.'s injuries because it is a common type of knife.

{¶ 21} On May 23, 2014, appellant was indicted of committing murder in violation of R.C. 2903.02(B) and 2929.02 (Count 1) and felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree (Count 2).

{¶ 22} While appellant was in the Lucas County Jail awaiting trial, he met a fellow inmate, David Meeker. Meeker spent "three to four" days in the same area of the jail as appellant. Meeker testified that he had two conversations with appellant during that time. The first once occurred when appellant called Meeker into his cell. Meeker asked what appellant wanted, and appellant said, "[w]ell, I've been charged with a murder of my roommate." Appellant added that, when the sheriff's deputies arrived, he was outside, and "I could have [run] away." Their second conversation occurred the next day, again in appellant's cell. Meeker testified,

> I walked in [his cell] and he was acting kind of nervous and walking
> back and forth in the cell. And he said, I got to get something off my chest.
> And I said, well, what are you talking about? And he said that he stabbed
> his roommate. And I said, what do you mean you stabbed your roommate?
> And he said, I stabbed my roommate. And I said, well, why did you stab
> her? And he said that he was - - she caught him in her pocketbook multi
> times [sic] and didn't want her to tell his dad because his dad had him stay
> there. And he said that he stabbed her. And I said, well, I thought you said

8.

the day before that you didn't stab her? And he said, I just had to get it off my chest.

{¶ 23} Appellant also told Meeker that he feared that J.U. was going to "kick him out" of the mobile home, and he admitted that he had been stealing from J.U. to support his drinking habit. A day or two after appellant confessed to Meeker, Meeker "had [his] wife" call the police, but she "couldn't get ahold of" anyone, so Meeker wrote a letter to the "Lucas County Detective Bureau asking to speak with them." Meeker was then transferred to a correctional facility in Orient, Ohio. In November or December, Meeker was "brought back" to Toledo to meet with Detective LaPlante, at which time Meeker recounted his conversations with appellant to him.

{¶ 24} At trial, Meeker admitted that appellant "rubbed [him] the wrong way." Meeker testified that he initiated contact with the police because, "she was 72 years old, and [I felt] it was the right thing to do then, and I feel it is the right thing to do now." Meeker denied that the state made any promise to him in exchange for his testimony at trial, or for coming forward in 2014.

{¶ 25} At the conclusion of appellant's five-day trial, a jury convicted him on both counts. The trial court sentenced appellant to a mandatory prison term of 15 years to life for murder and eight years for felonious assault, despite also finding that Counts 1 and 2 "are allied offenses of similar import and therefore are merged for purposes of sentencing." He raises the following assignments of error on appeal, which we will consider in turn:

9.

**Assignment of Error One**: Appellant's conviction is against the manifest weight of the evidence, and appellant is entitled to a new trial.

**Assignment of Error Two**: The trial court erred in failing to find prosecutorial misconduct after sustaining defense counsel's objections to closing arguments, and in failing to grant defense counsel's motion for a mistrial.

**Assignment of Error Three**: The trial court erred in merging appellant's convictions for murder and for felonious assault, and then sentencing appellant on both convictions.

**The Convictions are not Against the Manifest Weight of the Evidence**

{¶ 26} Appellant argues that his convictions were against the manifest weight of the evidence. Appellant was convicted of murder, in violation of R.C. 2903.02(B) ("No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree") and felonious assault, in violation of R.C. 2903.11(A)(2) ("No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance").

{¶ 27} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264,

¶ 25, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered.  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 28} A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.  Moreover, "'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416 (Feb. 6, 1997).

{¶ 29} Here, appellant argues that the jury lost its way "in resolving conflicting inferences to be drawn from the evidence," and posits several "equally likely" inferences that, he argues, should have weighed against his convictions.  Appellant argues:  (1) it is possible that the kitchen knife was not the murder weapon (given that it had no confirmed blood on it) and it is "equally likely" that a stranger stabbed J.U. with a weapon that was taken from the scene, or stabbed her with the scissors that tested positive for blood but

were not tested for DNA; (2) it is likely that the appellant got J.U.'s blood on his shoes by walking near the victim's body because the amount was small; (3) the appellant had no visible injuries and J.U.'s DNA was not found under his fingernails—which, he argues, demonstrates that he was not the perpetrator because the living room's disarray and J.U.'s defensive wound implies that a struggle occurred; (4) appellant could have merely picked up the plastic glove, which would explain the presence of his DNA; (5) appellant never confessed during his interviews with the police detectives and his story remained consistent; and (6) the fact that appellant did not tell the 911 operator that a woman had been stabbed until 39 seconds into the call, and that appellant told the 911 operator that he was not upset because the victim was not related to him, should have been interpreted to mean nothing more than he "reacts calmly under stress and shock" and was "extremely socially deficient."

{¶ 30} But, even if the jury could have somehow inferred appellant's innocence from these various pieces of evidence, a conviction is not against the manifest weight just because the jury was presented with evidence that supported a reasonable theory of innocence. *See State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). And, although appellant presents benign interpretations of certain evidence, we find that the evidence he relies upon can also be viewed as indicative of guilt: (1) the coroner testified that J.U.'s wounds were "consistent with" the kitchen knife, which was found in an area of the kitchen that tested

positive for blood; (2) Special Agent Dave Hammonds testified that stabbing victims typically do not bleed excessively and, therefore, the jury could have inferred that appellant got a small amount of blood on his shoes when stabbing J.U.; (3) even if a struggle had occurred, the fact that appellant did not have any injuries or J.U.'s DNA under his fingernails is understandable given that appellant could have easily overpowered an elderly, bedridden woman; (4) the jury could infer that appellant wore the plastic glove while stabbing J.U. because the glove was found with another plastic glove, containing J.U.'s blood, inside of it; (5) the jury could have reasonably believed that appellant was lying to police when he said he did not kill J.U.; and (6) appellant's strange behavior and statements during the 911 call were, at a minimum, "equally" indicative of appellant's guilt.

{¶ 31} Thus, at best, appellant has merely demonstrated that certain evidence was susceptible to different interpretations by the jury. But, "[a] defendant is not entitled to reversal on manifest-weight grounds merely because inconsistent evidence is presented at trial." *State v. Peterson*, 10th Dist. No. 12AP-646, 2013-Ohio-1807, ¶15.

{¶ 32} Moreover, the state introduced additional evidence against appellant at trial—most notably, Meeker's testimony that appellant explicitly confessed to killing J.U. "A conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony." *State v. Dean*, 6th Dist. Lucas No. L-16-1301, 2018-Ohio-1740, ¶ 44, quoting *State v. Houston*, 10th Dist. Franklin No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds). Here, the jury

13.

found Meeker's testimony credible. We extend special deference to the jury's credibility determinations given that the jury had the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 33} For all these reasons, we do not find that appellant's conviction is against the manifest weight of the evidence. Appellant's first assignment of error is not well-taken.

## The Prosecutor's Statements were not Prejudicial

{¶ 34} In his second assignment of error, appellant argues that the prosecutor made several statements during closing arguments that were improper and deprived him of his right to a fair trial.

{¶ 35} Prosecutors generally are entitled to considerable latitude in opening statements and closing arguments. *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996). A prosecutor's conduct at trial is not grounds for reversal unless that conduct deprived the defendant of a fair trial. *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994). "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

{¶ 36} Here, appellant claims that, during closing arguments, the prosecutor (1) improperly commented on the defense of "not guilty by reason of insanity" ("NGRI")

14.

(2) improperly bolstered Meeker's credibility by asserting that Meeker was telling "the truth" and (3) improperly referred to a neighbor's statement to the police that was not in evidence.

{¶ 37} First, regarding the NGRI defense, the prosecutor stated during closing arguments, "I want to talk about not guilty by reason of insanity. That is a defense in the law. Okay. And you heard defense counsel in its opening statement talk about * * * tragedies in the defendant's life [including that he] fell off a truck and he was dragged behind it for a while [and] was in a coma." The prosecutor also published a visual aid that referenced the NGRI defense. Defense counsel objected because there was no NGRI defense at issue in the case: the appellant had withdrawn a previously-asserted NGRI defense before trial ever began. The court sustained the objection, and stated that the prosecutor's comment was "wholly inappropriate." It instructed the jury that "[NGRI] is not part of this case, and you may not consider it for any purpose. I'm going to order that you disregard it * * * as well as the visual aid that was for your consideration."

{¶ 38} On appeal, appellant argues that he was prejudiced by the state's reference to a defense that he was not pursuing because it "shift[ed] the burden of proof in the jury's mind, such that appellant would not have had to show that he was 'insane' and therefore, that appellant would have to prove that he is *not guilty*." (Emphasis in original.) Insanity is an affirmative defense that must be proven by the defendant, by a preponderance of the evidence. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35; R.C. 2901.05(A).

15.

**{¶ 39}** We agree that the state's reference to the previously-withdrawn NGRI defense was improper because it was not relevant to any issue in the case and implies that appellant, in fact, stabbed J.U., which was contrary to his "not guilty" plea. The issue, then, is whether the state's improper reference to the NGRI defense during closing arguments prejudiced the appellant. To determine prejudice in this situation, we consider "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. McGlown*, 6th Dist. Lucas No. L-07-1163, 2009-Ohio-2160, ¶ 50, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995). Here, defense counsel immediately objected, and the court instructed the jury to disregard any reference to the NGRI comment. *Accord State v. Allen*, 73 Ohio St.3d 626, 639, 653 N.E.2d 675 (1995) (Overruling prosecutorial misconduct claim where the prosecutor asked questions "concerning [the defendant's] prior not guilty by reason of insanity pleas" where the defendant objected and the objection was sustained.) We presume the jury followed the court's instruction to disregard the prosecutor's comment. *State v. Goff*, 82 Ohio St.3d 123, 135, 694 N.E.2d 916 (1998). Moreover, the state presented strong evidence of appellant's guilt, including Meeker's testimony that appellant confessed to killing J.U., as well as incriminating DNA evidence, which further militates against a finding of prejudice. *See, e.g., State v. Hunt*, 10th Dist. Franklin No. 12AP-1037, 2013-Ohio-5326, ¶ 22 (Even if prosecutor's closing arguments constitute misconduct, it was not prejudicial because the state

16.

presented supportive DNA evidence and testimony from an eyewitness who saw defendant shoot victim).   For these reasons, we find that the prosecutor's comment, although improper, was not prejudicial and therefore does not warrant reversal.

{¶ 40} With regard to the second and third alleged instances of prosecutorial misconduct during the state's closing argument—i.e., alleged improper bolstering of Meeker's credibility and improper reference to a neighbor's statement to the police that was not in evidence—appellant concedes that there was no objection in either instance. If a defendant fails to object to a prosecutor's comments at trial, we review the comments only for plain error.  *State v. Boaston*, 6th Dist. Lucas No. L-15-1274, 2017-Ohio-8770, ¶ 82, discretionary appeal allowed on other grounds, 2018 Ohio LEXIS 1625 (June 27, 2018).  Prosecutorial misconduct rises to the level of plain error only if it is clear that the defendant would not have been convicted in the absence of the improper comments. *State v. Griffin*, 6th Dist. Lucas No. L-98-1215, 2000 Ohio App. LEXIS 5313, *5 (Nov. 17, 2000).  A finding of plain error should be made with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.  *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 41} Appellant takes issue with the following statement by the prosecutor regarding Meeker's testimony:

Why would somebody [like Meeker] come forward with that information?  Well, one, people are good citizens.  All right.  That is a thing even amongst people who are in the county jail.  All right.  And he also

talks about [how] this was a 72-year-old woman, and it might be a code of conduct there that says this is a particularly vicious crime, or he feels bad for this person or maybe he had a grandmother. I don't know. But he feels this is a crime beyond the ordinary. * * * [Meeker] walk[ed] two miles in the rain, in the morning, in the dark, to this courtroom to tell you what he heard with no consideration whatsoever given by anybody. What purpose does he have, other than this is the truth to make that statement?

{¶ 42} Appellant claims that the prosecutor bolstered Meeker's credibility with "improper opinion evidence." Prosecutors may not invade the realm of the jury by rendering their personal beliefs regarding guilt and credibility, or alluding to matters outside of the record. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). For example, prosecutors may "bolster their own witnesses, and conclude by saying, in effect, '[t]he evidence supports the conclusion that these witnesses are telling the truth.' But a prosecutor cannot say, 'I believe these witnesses,' because such argument invades the province of the jury, and invites the jury to decide the case based upon the credibility and status of the prosecutor." (Quotations omitted.) *State v. Jeffery*, 2d Dist. Montgomery No. 24916, 2013-Ohio-504, ¶ 20-21. In *Jeffery,* the prosecutor's comments included, "[t]hat's how you know she's telling the truth. She's not getting out of something. She's not getting something. She's doing it because it's the truth." *Id.* at ¶ 19. The court found that the comments did not amount to impermissible vouching because the

prosecutor never said that she personally believed the witness but merely that it was more likely that the state's witnesses were telling the truth, which is permissible. *Id*.

{¶ 43} Upon review, we find that the prosecutor in this case did not impermissibly vouch for Meeker's credibility. That is, the prosecutor did not state that he personally believed Meeker, nor did he place his (the prosecutor's) personal credibility at issue. Instead, he properly argued that certain facts, which were presented during the trial, demonstrated that Meeker was a credible, disinterested witness whose testimony, under the circumstances, made it more likely than not that he was telling the truth. *State v. Green*, 90 Ohio St.3d 352, 374, 2000-Ohio-182, 738 N.E.2d 1208.

{¶ 44} Finally, appellant contends that the prosecutor impermissibly asserted facts that were not in evidence pertaining to J.U.'s neighbor who told police—on the night of the murder—that she had heard a scream and saw appellant outside of the mobile home around 5:00 p.m. when he was allegedly taking a walk. A year later, the neighbor recanted her previous statement. During closing arguments, the prosecutor speculated that the neighbor "changed her story [because] she doesn't want to be a witness in this case anymore, or something has happened that [caused her] a year later to change her statement." The prosecutor also pointed out that the neighbor still lives next door to William Akers, the appellant's father, and implied that may be why she "changed her story."

{¶ 45} Appellant claims that it was improper for the prosecutor to speculate as to why appellant's neighbor had recanted, ostensibly because there was no definitive

19.

evidence presented as to *why*, exactly, the neighbor recanted.  But the prosecutor was merely drawing reasonable inferences from the evidence that was presented at trial. "Generally, the state may comment freely on 'what the evidence has shown and what reasonable inference may be drawn therefrom.'" *State v. Smith*, 6th Dist. Lucas No. L-15-1027, 2017-Ohio-776 ¶ 55, quoting *Lott*, 151 Ohio St.3d at 165, 555 N.E.2d 293.

{¶ 46} For the above reasons, we find that appellant's second assignment of error is not well-taken.

**The Murder and Felonious Assault Convictions Merge for Purposes of Sentencing**

{¶ 47} In its sentencing entry, the court found that "Count One [murder] & Count Two [felonious assault] are allied offenses of similar import, and therefore, are merged for purposes of sentencing."  Despite that finding, the trial court sentenced appellant to 15 years to life in prison for murder and eight years for felonious assault.  In his third assignment of error, appellant argues that the trial court should not have imposed any sentence as to the felonious assault conviction.  The state agrees.  Indeed, "when a trial court concludes that an accused has in fact been found guilty of allied offenses of similar import, it cannot impose a separate sentence for each offense.  Rather, the court has a mandatory duty to merge the allied offenses by imposing a single sentence, and the imposition of separate sentences for those offenses - even if imposed concurrently - is contrary to law[.]" *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 28.

20.

**{¶ 48}** Appellant's third assignment of error is well-taken. Because the trial court imposed a separate sentence for murder, we need not remand the case for resentencing, but may instead merge the sentences and vacate the eight-year, separate sentence for felonious assault. *Williams* at ¶ 32-33; *State v. Bradley*, 2d Dist. Greene No. 2017-CA-64, 2018-Ohio-3192, ¶ 9.

### Conclusion

**{¶ 49}** For the reasons set forth above, appellant's first and second assignments of error are not well-taken. The third assignment of error is well-taken, and we modify the trial court's judgment by merging the sentences and vacating the eight-year sentence it imposed for felonious assault, and the corresponding imposition of the separate three years of mandatory postrelease control. The April 24, 2017 judgement entry of the Lucas County Court of Common Pleas is otherwise affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and modified, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                                  _____

                                                         JUDGE

Arlene Singer, J.

                                   _____

Christine E. Mayle, P.J.                                    JUDGE
CONCUR.

                                   _____
                                                         JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.