**[Cite as *State v. Brook*, 2024-Ohio-3074.]**

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2023CA0036 |
| WILLIAM BROOK | : |  |
|  | : |  |
| Defendant-Appellant | : | <u>OPINION</u> |


CHARACTER OF PROCEEDING: Appeal from the Richland County Court of
Common Pleas, Case No. 22CR673


JUDGMENT: Affirmed


DATE OF JUDGMENT ENTRY: August 9, 2024


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JODIE M. SCHUMACHER                WILLIAM T. CRAMER
Prosecuting Attorney                    470 Olde Worhtington Road
BY: MICHELLE FINK                      Suite 200
Assistant Prosecuting Attorney      Westerville, OH  43082
38 South Park Street
Mansfield, OH 44902

*Gwin, J.,*

**{¶1}** Defendant-Appellant William Brook, ["Brook"] was convicted after a jury trial of Rape, Sexual Battery and Gross Imposition involving both his daughter, S.B., and the daughter's friend, J.H. On appeal, he argues the state failed to prove two separate acts of sexual conduct with respect to S.B.; the trial judge erred by allowing the state to present the testimony of a sexual assault nurse when the state failed to provide a report or *curriculum vitae* twenty-one days before trial; and the trial judge erred by allowing the state to present out-of-court statements made by each victim to a Children Services Worker.

**{¶2}** Because we find evidence of two separate acts of sexual conduct with S.B. were proven beyond a reasonable doubt and that Brook has failed to establish the admission of the SANE nurse's testimony or the testimony of the Children Services worker affected his substantial rights, we affirm the judgment of the Richland County Court of Common Pleas.

### *Facts and Procedural History*

**{¶3}** In September 2022, Brook was indicted for five counts of Rape in violation of R.C. 2907.02(A)(2) [Force/Threat of Force], all first-degree felonies; two counts of Sexual Battery in violation of R.C. 2907.03(A)(5), both third-degree felonies; and one count of Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), a fourth-degree felony. The allegations related to two separate alleged victims, S.B. and J.H., one of whom was Brook's daughter.

**{¶4}** On November 14, 2022, Brook filed a motion to suppress statements that he made to a Children Services investigator at a police station, arguing that he was in

custody and was not provided *Miranda* warnings. [Docket Entry No. 14]. The judge held an evidentiary hearing on January 20, 2023. The trial judge denied the motion by Judgment Entry filed January 25, 2023. [Docket Entry No. 34].

**{¶5}** A jury trial commenced on June 6, 2023 and concluded on June 9, 2023.

*Brook supervised S.B. and J.H. during the 2020 – 2021 school year*

**{¶6}** During the summer of 2020, when the pandemic started, S.B. was thirteen years old and going into the eighth grade. 2T. at 460-464.[1] J.H. was the same age. Id. at 502. S.B. turned fourteen on July 5, 2020 before the start of school, and J.H. did so during the Christmas break on December 28, 2020. 2T. at 458, 502. The girls attended the same school and engaged in remote learning that year due to the pandemic. Id. at 463, 511. They thought of each other as best friends and often went to each other's homes. Id. at 462, 510. The parents of the girls were also acquainted. Id. at 462, 510, 538. The girls went to S.B.'s house more often as S.B.'s father, Brook received disability and was the only parent at home during school hours. Id. at 463-464, 511-512. S.B.'s mother was working in Columbus and J.H.'s parents both worked.

*S.B.'s testifies that Brook sexually abused her*

**{¶7}** There were times when Brook told S.B. that, because she had a bad back and it liked to pop out a lot, he was going to help her so that her back would stop hurting. 2T. at 467. He did this by using his "chi," through his penis. Id. S.B. explained that "chi" is your life energy. Id. To accomplish this Brook told S.B. that skin-to-skin contact is the best. Id. at 469. Brook would have her take off all of her clothes and normally had her lay

---

[1] For clarity, the transcript of Brook's jury trial will be referred to as "__T.__" signifying the volume and page number.

down on her tummy, then rub his penis along her vagina. Id. He would also put his tongue in S.B.'s vagina and lick there. Id. at 468. S.B. further testified that Brook inserted his fingers into her vagina. Id. at 472. S.B. could not remember the first time this occurred, but it was not during the summer before she started eighth grade. Id. at 467.

{¶8} On Wednesday, June 16, 2021, prior to S.B.'s fourteenth birthday, Brook took S.B. to a hotel. 2T. at 481; 3T. at 719; State's Exhibit 6. It was S.B.'s mother's understanding that her husband reserved the room because he was helping J.H. with her spiritual guidance and it was going to be a time of quiet and reflection for J.H. 2T. at 610. Brook held bible studies and presented himself as a spiritual leader. Id. However, J.H.'s parents decided not to allow Brook to take their daughter to the hotel. 2T. at 572-573. After that, the relationship between the families cooled and after S.B.'s birthday party in early July the girls stopped going to each other's homes. Id. at 573.

{¶9} While alone in the hotel room, Brook told S.B. that "his nuts were up inside of him and that he needed me to help him get them out." Id. Brook had S.B. use her hands on his penis. Brook said that was not working. Brook eventually had S.B. put his penis inside her vagina and go up and down until white stuff started to come out of his penis. Id.

{¶10} S.B. testified that the Monday after Thanksgiving 2021, Brook told her he needed to fix her back using his "chi." 2T. at 484. At that time Brook put his penis inside S.B.'s vagina. 2T. at 484; 487. Brook began pulling it in and out saying it would help loosen her back. Id. During this incident, Brook would also squeeze S.B.'s "boobs." Id at 487. S.B. could not remember if during this time Brook put his mouth on her vagina. Id. The incident occurred in her parent's bedroom on Bell Street in Bellville. Id. at 485.

{¶11} On the following day, Tuesday, November 30, 2021, S.B. was at the bus stop where another girl was talking about how her dad used to abuse her. While she was talking, S.B. realized that what the girl was describing sounded like the things Brook had done to her. 2T. at 490. S.B. pulled a friend aside, telling her that she was pretty sure Brook was abusing her and that she had not realized it until just then. The friend told S.B. that she needed to tell someone. She went on the bus, arrived at school, and went to her first class. She decided she needed to follow her friend's advice and tell someone, so S.B. went to the office and told the school assistant principal. 2T. at 489-491.

{¶12} S.B. testified that it was a lot to remember and that she testified to the best of her memory. Id. at 495. She further could not recall if she told the SANE nurse whether Brook put his mouth on her vagina; however, S.B. testified that whatever she told the SANE nurse was the truth. Id. at 496. S.B. testified that she was afraid to tell anyone because Brook told her that her punishment "would be 100 times worse once he got out of prison. That's his exact words." 2T. at 477-478.

*S.B.'s testifies that Brook sexually abused J.H.*

{¶13} S.B. testified that one day after school started in September 2020, J.H. was over at S.B.'s house and Brook had them both in the bedroom. 2T. at 471-472. Brook told J.H. the same thing he told S.B. about using his "chi" to make her relax. Brook had J.H. on her belly on the bed and was rubbing his penis on her vagina. Id. Brook had S.H. hold J.H.'s hand during this so that S.B. could use her "chi" to help J.H. Id. at 473. S.B. saw Brook take off his shorts. Id. at 475. She also observed Brook rubbing his penis on J.H.'s butt and vagina. Id. at 475. After Brook left the bedroom, S.B. hugged J.H. and told her it was "o.k., he does that to me too." Id.

at 476. S.B. remembered that the friends did schooling after that and it must have been "at the beginning of our 8th grade year, because we were doing schooling." 2T. at 477.

*J.H. testifies Brook sexually abused her*

{¶14} On at least three separate occasions when the girls were at S.B.'s home, Brook engaged in sexual offenses against J.H. The first time Brook led J.H. into his bedroom to "work" on her back. 2T. at 514. Brook touched her vagina with his finger, moving his finger in and out of her vagina. Id. at 515-516. J.H. did not understand what was happening and did not even think to try to stop Brook. Id. at 518.

{¶15} J.H. testified that during her 8th grade year, sometime before December of that year, a second incident occurred. 2T. at 519-520. Brook again took her into his bedroom under the guise of working on her back. Id. at 520-521. Brook moved her pajama shorts to the side and "fingered" her. Id. at 521. J.H. made up an excuse that she had to use the bathroom so that Brook would stop. Id. at 520.

{¶16} When the third incident occurred, S.B. was also present in Brook's bedroom. 2T. at 522. Brook began by placing his hands on J.H.'s back. Id. Brook then pulled her sweatpants down to J.H.'s mid-thigh. He started grinding against her butt, rubbing his penis against her. Id.

{¶17} A fourth offense occurred at J.H.'s home near or after the end of school in late May or early June of 2021, after J.H. had turned fourteen. 2T. at 527-528. J.H. was in her bedroom in Richland County alone. 2T. at 529. Brook was sitting on the staircase, the only way out of her attic room. Id. at 528. J.H. heard Brook walking up the stairs. Id. at 529. Brook said he could talk to God, and God was giving her a few options. Id.

She could not remember all of them, but did remember there were at least four and could recall some details of two of the options. Id. at 530. First, something bad would happen to her family. Id. J.H. picked this option initially because it seemed the least bad, but Brook said God took that option away. Id. J.H. then picked another option which seemed like the least worst of the remaining options. Id. at 530-531. The second option required J.H. to give Brook a hand job, let Brook put his fingers in her vagina, and then touch her vagina to his penis. Id. at 531. J.H. used her hand on Brook's penis, and then Brook had her lay down and he put his fingers insider her vagina. Brook then said that since she took so long to pick an option, he had to actually stick the tip of his penis into her vagina. Id. at 531-532. Brook then said he put the tip of his penis inside her vagina, although J.H. testified that she did not see it happen and did not feel anything. Id. at 533.

{¶18} After this last incident, J.H. was invited to go to a hotel with S.B. and Brook at the end of school before S.B.'s birthday. J.H. felt like she had to go even though she did not really want to go to the hotel. However, J.H. was not able to go because her dad had her stay with other friends that week. 2T. at 539 - 541. After that, J.H. and S.B. did not hang out together. Id. at 541.

*S.B. and J.H. are examined at the hospital*

{¶19} On December 8, 2021, S.B. was examined at Avita Ontario Hospital by a Sexual Assault Nurse Examiner ["SANE], Tammy Robertson. 3T. at 642; 663. Robertson explained that as part of the examination S.B. shared that S.B.'s father had inappropriately touched her multiple times over the prior two years and that the last time Brook sexually assaulted S.B. was around Thanksgiving of that same year. Id. at 666 -

667; 670-671. S.B. shared with Robertson that Brook put his mouth on her vagina, licked and sucked her vagina, and placed his tongue in her vagina. Id. at 668. S.B. also disclosed to Robertson that Brook put his penis in S.B.'s vagina then moved his penis in and out of her vagina. Id. at 667. While he was doing these things, Brook had his hands on her hips but also moved his hands to squeeze her breasts under her shirt. Id.

{¶20} On December 15, 2021, J.H. was examined at Avita Ontario Hospital by the same SANE nurse, Tammy Robertson. 3T. at 671. Robertson explained that as part of the examination J.H. told her that S.B. is her friend and that S.B.'s dad, Brook, told her that he was going to work on her hips like a chiropractor. 3T. at 674. While she was laying on her back on his bed in his bedroom she was wearing shorts which Brook moved aside along with her underwear, putting his finger in her vagina. Id. He moved his finger in and out of her vagina. Id. at 675.

{¶21} J.H. also explained to Robertson that the previous year she was experiencing pain in her epigastric area while at S.B.'s house, so she told Brook. 3T. at 675. Brook laid her down in his room and started pushing down on her belly. J.H. explained that Brook then did the same thing he had the previous time and placed his fingers in her vagina. Id. J.H. shared that after he was done, Brook apologized about 30 minutes later and said he got confused where her pain was. Id. at 675-676.

{¶22} J.H. next shared with Robertson a time when S.B. was also in the room when an offense occurred. 3T. at 676. Brook said he was going to do something to J.H.'s back, because she had a "C" on her spine, and S.B. was in the room to use her "chi" by holding on to J.H.'s arm to transfer her energy to J.H. Id. Brook had S.B. keep her eyes closed to keep her focus. Id. Brook began by pressing down on J.H.'s back. Brook next

pulled down her sweatpants and started pressing down on her tailbone with his hands. Brook then put his penis in J.H.'s butt, moving back and forth behind her in a grinding motion. Id. After Brook left the room, S.B. said, "I am sorry," and "he has done that to me, too." Id. at 676.

{¶23} J.H. disclosed to Robertson one more event. This time J.H. was in her own bedroom. Brook said he could talk to God, and that God was giving J.H. four options. 3T. at 677. J.H. could only remember two of them and that she wanted to choose the one where something bad was going to happen to her family. She could not remember exactly what, but she knew it was bad. Id.

{¶24} When she chose that one, Brook said God removed that one and it was no longer a choice. She then chose the least bad one out of the others, which was he would "finger" her in her vagina, she would "play " with his penis and he had to touch the tip of his penis to her vagina. 3T. at 677. J.H. explained that all of that happened, but at the end he said she took too long to choose, so now he had to put his penis in her vagina and he did that. He was moving in and out of her vagina with his penis and then he took his penis out and ejaculated on her sweatshirt. Id. at 377-378. J.H. disclosed that Brook anally penetrated her with his penis but did not disclose any of the facts surrounding that occasion. Id. at 678.

{¶25} Both S.B. and J.H. spoke with a representative of the Richland County Children Services, independently, and provided similar details. 3T. at 692- 724.

*The Investigation*

{¶26} After her initial interview at the school with school officials and S.B., Jolene Zehner from Children Protective Services worked with law enforcement to investigate.

She contacted S.B.'s parents and asked them to come to the police station. 3T. at 706 – 707; 714-715; 725. The parents were placed in separate interview rooms. Id. at 708. Brook was interviewed first and said some things that Zehner considered to be red flags. Id. at 710. Brook noted some instances that he thought could be misconstrued as inappropriate. For instance, Brook said that he sometimes needed help getting his shorts on due to his disability. Id. at 736-737. Brook also said S.B. would sit on his lap so he could put zit cream on her back. Id. at 737. Brook said he put his finger on S.B.'s vagina to check an infected hair, he talked about naked massages for S.B., and he said they may have accidentally touched each other while wrestling or doing Ju-Jitsu. Id. at 739. Brook seemed to acknowledge that some of these things were inappropriate and they made him uncomfortable, but he continued to do them. Id. at 741. Brook said that S.B. was a good girl and he did not understand why she was saying these things. Id. at 742. A video recording of the interview was played for the jury. 3T. at 734; State's Exhibit 4.

{¶27} S.B.'s mother indicated that she was afraid of Brook, so they were concerned that she could not protect S.B. even if Brook left the home. 3T. at 710. As a result, Zehner had S.B. stay with someone that the parents could agree. Id. at 711.

{¶28} Zehner admitted that Brook agreed to leave the house, and he followed the rules regarding no contact. 3T. at 755. Zehner further admitted that Brook even returned voluntarily for a second interview and he was cooperative during that interview. Id. at 751; 754. The second interview occurred at the police station after the forensic interview of both girls. Zehner thought the second interview was being recorded, but that did not happen due to technical difficulties. 3T. at 757. During the interview, Brook confirmed taking S.B. to the hotel and his story was nearly identical to her story, but for the sex. Id.

at 757-758. Zehner confronted Brook with the stories from both girls and he denied that anything happened. Id. at 758-759. After S.B. mentioned having sex at a hotel, Zehner directed law enforcement to locate the hotel and obtain a receipt in Brook's name from June 2021. 3T. at 719-720; State's Exhibit 6.

{¶29} After deliberations, the jury returned guilty verdicts on all counts. However, after the verdicts were read aloud, the prosecution noted that the verdict form for Count Six listed the wrong victim. 4T. at 838-839. With the agreement of defense counsel, the trial judge sent the verdicts back with the jury with instructions to review the victim on count six and make any corrections. Id. at 839-840. The jury corrected the victim on Count Six. Id. at 841. The trial judge deferred sentencing. Id.

{¶30} Sentencing took place on June 28, 2023. The judge merged the sexual battery counts into the first two rape counts pursuant to R.C. 2941.25. The trial judge then imposed maximum prison terms of eleven years on each of the five rape counts and eighteen months for gross sexual imposition. The first count for rape was imposed as an indeterminate term of eleven years up to sixteen years and six months. All prison terms were imposed consecutively, for an aggregate indeterminate prison term of fifty-six years and six months up to sixty- two years. Additionally, the court imposed a mandatory term of two to five years of post-release control and Brook was declared to be a Tier III sex offender. Finally, the court granted Brook 261 days of jail credits. Sent. T. at 892-893; 895-898.

### Assignments of Error

{¶31} Brook raises four Assignments of Error,

{¶32} "I. APPELLANT'S DUE PROCESS RIGHTS WERE VIOLATED BY CONVICTIONS ON TWO COUNTS OF RAPE AND SEXUAL BATTERY THAT WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE OF TWO SEPARATE ACTS OF SEXUAL CONDUCT;

{¶33} "II. APPELLANT'S CONVICTIONS FOR ONE COUNT OF RAPE AND THE GUILTY FINDING ON ONE COUNT OF SEXUAL BATTERY WERE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE;

{¶34} "III. TESTIMONY OF SEXUAL ASSAULT NURSE EXAMINER WAS IMPROPERLY ADMITTED WITHOUT A TIMELY REPORT OR CURRICULUM VITAE HAVING BEEN PROVIDED IN COMPLIANCE WITH CRIM.R. 16(K);

{¶35} "IV. THE TRIAL COURT ERRED BY FAILING TO EXCLUDE HEARSAY TESTIMONY FROM THE CHILDREN SERVICES INVESTIGATOR RELATING DETAILS PROVIDED BY THE VICTIMS DURING FORENSIC INTERVIEWS THAT WERE CONDUCTED AT A POLICE STATION A WEEK AFTER THE INITIAL DISCLOSURES.

I.

{¶36} In his First Assignment of Error, Brook contends the evidence was insufficient to prove two separate acts of sexual conduct against S.B. on November 29, 2021 as alleged in the Indictment; therefore, Brook argues this Court should strike the conviction on Count Two for Rape and the conviction on Count Four for Sexual Battery[2].

**Standard of Appellate Review – Sufficiency of the Evidence**

---

[2] The trial judge merged the sexual battery counts into the first two rape counts pursuant to R.C. 2941.25. However, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. *State v. Whitfield*, 2010-Ohio-2, ¶26.

**{¶37}** The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99 (2013); *Hurst v. Florida*, 577 U.S. 92 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker*, 2016-Ohio-8295, ¶30; *State v. Jordan,* 2023-Ohio-3800, ¶13. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson*, 2016-Ohio-8448, ¶13.

**{¶38}** When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, (1997)*; *Walker*, 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*,

2006-Ohio-5283, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430 (1997); *State v. Montgomery*, 2016-Ohio-5487, ¶74.

**Issue for Appellate Review**: *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Brook was guilty beyond a reasonable doubt of two acts of sexual conduct with respect to S.B.*

**{¶39}** Brook was charged and convicted of two counts of Rape in violation of R.C. 2907.02(A)(2) and two counts of Sexual Battery in violation of R.C. 2907.03(A)(5) stemming from offenses he committed against his daughter, S.B., on November 29, 2021, the Monday following Thanksgiving in 2021.

**{¶40}** Brook's argument is focused on the evidence presented regarding the two separate acts of sexual conduct he perpetrated upon S.B. on that date which form the basis of that element of each of the offenses. The two Sexual Battery counts were charged alternatively to the two Rape counts. Brook was found guilty on all four counts but each Sexual Battery conviction was merged with the corresponding Rape conviction for purposes of sentencing.

**{¶41}** R.C. 2907.01 provides, in relevant part,

(A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶42} Concerning the allegations that occurred in November 2021, the jury heard S.B. testify that the Monday after Thanksgiving 2021, Brook told her he needed to fix her back using his "chi." 2T. at 484. At that time Brook put his penis inside S.B.'s vagina. 2T. at 484; 487. S.B. could not remember if during this time Brook put his mouth on her vagina. Id. S.B. testified that it was a lot to remember and that she testified to the best of her memory. Id. at 495. She further could not recall if she told the SANE nurse whether Brook put his mouth on her vagina; however, S.B. testified that whatever she told the SANE nurse was the truth. Id. at 496.

{¶43} The SANE nurse testified S.B. shared that S.B.'s father had inappropriately touched her multiple times over the prior two years and that the last time Brook sexually assaulted S.B. was around Thanksgiving of that same year. 2T. at 666 - 667; 670-671. S.B. shared with Robertson that Brook put his mouth on her vagina, licked and sucked her vagina, and placed his tongue in her vagina. Id. at 668. S.B. also disclosed to Robertson that Brook put his penis in S.B.'s vagina then moved his penis in and out of her vagina. Id. at 667. Robertson admitted that she did not remember exactly what S.B. said about the last time Brook had sex with her. Id. at 718.

{¶44} We find instructive the case law that has developed concerning the failure to provide exact dates upon which a sexual assault is alleged to have occurred. In those cases, courts have found specificity as to the time and date of an offense is not required in an indictment. Under R.C. 2941.03: "an indictment or information is sufficient if it can be understood therefrom: * * * (E) That the offense was committed at some time prior to the time of filing of the indictment * * *."   An indictment is not invalid for failing to state the time of an alleged offense or doing so imperfectly. The State is not required to prove that

an offense occurred on any specific date, but rather may prove that the offense occurred on a date reasonably near that charged in the indictment. *State v. Adams*, 2002-Ohio-5953, ¶ 8 (5th Dist.).

**{¶45}** If such is not fatal to an indictment, it follows that impreciseness and inexactitude of the evidence at trial is not "per se impermissible or necessarily fatal to a prosecution." *State v. Robinette*, 1987 WL 7153 (5th Dist. Feb 27, 1987); *State v. Davis*, 2024-Ohio-1504, ¶ 18 (5th Dist.), *appeal not allowed*, 2024-Ohio-2576, ¶18. The question in such cases is whether the inexactitude of temporal information truly prejudices the accused's ability fairly to defend himself. *State v. Sellards,* 17 Ohio St.3d 169(1985); *State v. Gingell* Ohio App.3d 364, 368 (1st Dist. 1982); *State v. Kinney*, 35 Ohio App.3d 84 (1st Dist. 1987). Brook has not argued or alleged that the inexactitude prejudiced his ability to defend himself at trial.

**{¶46}** Grafted upon the question of prejudice is a problem that cases of child abuse invariably present, i.e., a victim-witness who, due to tender years, does not have the temporal memory of an adult and has problems remembering exact times. As this court has noted, "[t]ime is neither essential nor an element of the crime of sexual battery." *State v. Robinette*, supra. In *Robinette,* this Court noted,

> We note that these particular cases often make it more difficult to ascertain specific dates. The victims are young children who may reasonably be unable to remember exact times and dates of psychologically traumatic sexual abuses. This is especially true where the crimes involve several instances of abuse spread out over an extended period of time. *State v. Humfleet* (Sept. 9, 1985), Clermont App. No. CA84-04-031,

unreported, at 15. The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse. An allowance for reasonableness and inexactitude must be made for such cases considering the circumstances.

**{¶47}** In *State v. Sellards*, 17 Ohio St.3d 169 (1985), the Supreme Court gave two examples of when the failure to provide specific dates and times could be prejudicial to the accused. The Court first noted that if the age of the victim were an element of the crime with which the accused had been charged and the victim bordered on the age required to make the conduct criminal, then the failure to provide a more specific time frame would be prejudicial. This is true because "specific dates of sexual conduct might well have become critical to the accused's ability to prepare a defense, since sexual conduct toward one thirteen years of age or older would not constitute the offense of rape as defined in the charged section of the criminal code, R.C. 2907.02(A)(3)." *Sellards*, 17 Ohio St.3d at 172. The second situation is where "the defendant had been imprisoned or was indisputably elsewhere during part but not all of the intervals of time set out in the indictment. Again, under such circumstances, the inability of the state to produce a greater degree of specificity would unquestionably prejudice the defense." Id. The *Sellards* court noted: "the record in this case does not indicate that the failure to provide the accused with a specific date was a material detriment to the preparation of his defense.

**{¶48}** In the case at bar, S.B. testified that Brook committed, at the very least, two separate acts of sexual conduct upon her. The fact that at the time of trial she is unclear

as to the exact date those acts occurred does not diminish the fact that they did occur. Brook did not put forth evidence of any alibi for the 2021 – 2022 year. Brook denied that any sexual conduct occurred in his interview with the Children Services investigator. The jurors were able to observe S.B. and Robertson during trial, subject to cross-examination.

{¶49} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Brook committed two separate acts of sexual conduct against S.B. We hold, therefore, that the state met its burden of production regarding the crimes of Rape and Sexual Battery as alleged in Counts One, Two, Three and Four of the Indictment and, accordingly, there was sufficient evidence to submit the charges to the jury and to support conviction.

{¶50} Brook's First Assignment of Error is overruled.

II.

{¶51} In his Second Assignment of Error, Brook argues his conviction for two separate acts of sexual conduct against S.B. on November 29, 2021 as alleged in the Indictment are against the manifest weight of the evidence.

**Standard of Review – Manifest Weight**

{¶52} The term "'manifest weight of the evidence'. . . relates to persuasion." *Eastley v. Volkman*, 2012-Ohio-2179, ¶19. It "concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387(1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 102 at n.4 (1997)*; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

**{¶53}** As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d at 386–387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001).

**{¶54}** Weight of the evidence addresses the evidence's effect of inducing belief. *Thompkins*, at 386-387; *State v. Williams*, 2003-Ohio-4396, ¶83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387, *citing Tibbs v. Florida*, 457 U.S. 31, 42(1982) (quotation marks omitted); *State v. Wilson*, 2007-Ohio-2202, ¶25, citing *Thompkins*.

**{¶55}** In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley*, 2012-Ohio-2179 at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶56}** When there is conflicting testimony presented at trial, a defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented. "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Seasons Coal Co.,*

*Inc* at fn. 3, quoting 5 Ohio Jur.3d, Appellate Review, §603, at 191-192 (1978); *In re Z.C.,* 2023-Ohio-4703, ¶14.

{¶57} The interplay between the presumption of correctness and the ability of an appellate court to reverse a verdict based on the manifest weight of the evidence has been stated as follows, "'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Seasons Coal Co.*, 10 Ohio St.3d at 80, *quoting C.E. Morris Co. v. Foley Construction Co.*, 54 Ohio St.2d 279, 280 - 281. *See, also, Frankenmuth Mut. Ins. Co. v. Selz,* 6 Ohio St.3d 169, 172 (1983); In re Sekulich, 65 Ohio St.2d 13, 16 (1981). "The central question is whether 'there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.' (Emphasis sic.) *State v. Getsy*, 84 Ohio St.3d 180, 193-194, 702 N.E.2d 866 (1998), *citing State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus, *superseded by constitutional amendment on other grounds as stated in Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668(1997)." State v. Nicholson,* 2024-Ohio-604, ¶71. A manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist. 1983); Nicholson at ¶71.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered*

{¶58}   In the case at bar, S.B. testified that Brook committed, at the very least, two separate acts of sexual conduct upon her. Because S.B. testified, the jury was able to judge for themselves her appearance on the stand, manner of testifying, the reasonableness of her testimony, the accuracy of memory, frankness or lack of it, and any bias she may have. 4T. at 783-784.

{¶59}   We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the entire record in this matter we find Brook's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Brook's guilt.

{¶60}   Finally, upon careful consideration of the record in its entirety, we find as set forth above, there is substantial evidence on which the jury could properly conclude beyond a reasonable doubt that Brook committed two separate acts of sexual conduct against S.B. *State v. Nicholson,* 2024-Ohio-604, ¶75. Therefore, in light of the evidence, as well as the record in its entirety, we find the jury clearly did not lose its way concluding that Brook was guilty. We find that the jury did not disregard or overlooked compelling evidence that weighed against conviction.

{¶61}   Brook's Second Assignment of Error is overruled.

III.

**{¶62}** In his Third Assignment of Error, Brook argues the trial judge erred by overruling his objection and permitting the SANE Nurse to testify because the defense had never been provided with an expert report and was provided a CV[3] just before trial in violation of Crim.R. 16(K).

**{¶63}** Prior to the testimony of the SANE nurse, Tammy Robertson, Brook's attorney objected because the state did not provide her C.V. twenty-one days before trial. 3T. at 629. Brook's further objected,

> [I]f it is this witness's intention to talk about why certain victims or girls in this position say what they say or don't say what they say or delay in saying so on so forth, that, in my opinion, is an area of expertise reserved for the psychologist or the psychiatrist. And, in fact, if that is her opinion, that's an opinion I should have had 21 days before trial pursuant to the rule.
>
> …

3T. at 629-630. Defense counsel further objected to the last four pages of the SANE exam report, the discharge notes entitled, "Pediatric/Adolescent Scheduled Exam Discharge Instructions." Id. at 631. Defense counsel noted at paragraph 3 it talks about, "Listen carefully to your child. Children rarely lie about sexual abuse; therefore, it is crucial that they be believed." Id. Counsel asked that those pages not be given to the jury in the event the judge permits Ms. Robertson to testify. Id.

---

[3] Curriculum vitae is a short-written summary of a person's career, education and qualifications.

{¶64} The state conceded, "We have no expert report in this case." Id. at 632. After discussion in which the trial judge expressed concern for those remarks contained in the medical records, the trial judge stated,

Well, I think the witness in this case, she has testified in this court before and has been deemed an expert prior. And I think that even if this was not included in this, she might give an opinion as to that. So, ultimately, it would be the same thing. So, at this point I am going to overrule the objection.

The court is going to indicate that the expert has been identified at least 21 days beforehand, a curriculum vitae is not required to be given 21 days before, but you were made aware of the witness. And there is no expert report in this matter, so the court is going to overrule that objection and allow it to come in at this time.

3T. at 638.

{¶65} At trial, the trial judge upon motion of the state, and without objection by defense counsel, found, "So at this time the witness is hereby deemed an expert for the purpose of providing opinion testimony as to the field of SANE examination." 3T. at 661.

{¶66} During direct examination, the following exchange took place,

[Prosecutor]: In your training and experience, have you experienced individuals that have delayed scheduling their examinations?

[Robertson]: Yes. It is very much known. It is called "conspiracy of silence." It happens a lot with children, mostly, adults as well, that you don't—most people don't report initially immediately.

[Prosecutor]: Is another common term "delayed disclosure"?

[Robertson]:  Correct.

[Prosecutor]: And why is that?

[Robertson]: Hmm, so like, one, a lot of times it is caused by the— those hormones that are released and that disassociation of not remembering what truly had happened. Something may trigger. Or they are afraid they are not going to be believed. Or what's the consequences if I do report after I report? So it's very uncommon (sic.) that people don't report period.

[Prosecutor]: Based on your extensive experience and training have you seen this a lot?

[Robertson]: Yes.

3T. at 680-681. Robertson further testified concerning the "neurobiology of trauma." 3T. at 655 - 656. And further, the impact of trauma on memory. Id. at 657. Brook renewed his objection to Robertson's testimony. Id. at 683. The trial judge again overruled his objection. Id.

**Standard of Appellate Review**

{¶67} An appellate court's standard of review on evidentiary and discovery matters is an abuse of discretion. *State v. Kopchak*, 2018-Ohio-1136, ¶ 15 (5th Dist.), *citing State v. Elliott*, 2008-Ohio-5673, ¶ 23 (5th Dist.). An abuse of discretion can be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *Tennant v. Gallick,* 2014-Ohio-477, ¶35 (9th Dist.);

In *re Guardianship of S.H.*, 2013–Ohio–4380, ¶ 9 (9th Dist.); *State v. Firouzmandi,* 2006–Ohio–5823, ¶54 (5th Dist.).

*Crim.R. 16(K)*

**{¶68}** Crim.R. 16 governs discovery in criminal cases. Effective July 1, 2010, Crim.R. 16 underwent comprehensive changes in large part to strengthen the protections of a defendant's constitutional due-process rights to a fair trial. Grove, Criminal Discovery in Ohio: "Civilizing" Criminal Rule 16, 36 U.Dayton L.Rev. 143, 144-145 (2011) *cited in State v. Boaston,* 2020-Ohio-1061, ¶ 44. In *Boaston,* the Court noted, "As part of the rule's changes in 2010, Crim.R. 16(K) was adopted, *requiring that expert witnesses generate written reports* and that those reports be disclosed to the opposing party no later than 21 days before trial." *Boaston*, ¶46. Emphasis added.

**{¶69}** When faced with the question of whether delayed disclosure testimony is lay or expert opinion testimony our brethren from the Sixth District observed,

> In *McGlown*, we recognized that several Ohio courts have found that "the manner in which child victims of sexual abuse disclose and report that abuse is beyond the knowledge and experience of lay persons." *McGlown, supra*, 6th Dist. Lucas No. L-07-1163, 2009-Ohio-2160, at ¶ 41, *citing State v. Bortner*, 9th Dist. Lorain No. 02CA008189, 2003-Ohio-3508; *State v. Carey*, 2d Dist. Miami No. 2002-CA-70, 2003-Ohio-2684; *State v. Carte*, 8th Dist. Cuyahoga No. 72955, 1999 WL 13962 (Jan. 14, 1999); *State v. James*, 3d Dist. No. 6-94-18, (Aug. 24, 1995). Similarly, in *Solether*, we held that an officer's testimony about delayed reporting by sexual assault victims "is not within the knowledge of the average juror," "required 'specialized

knowledge,'" and "is properly categorized as expert testimony" notwithstanding the fact that such testimony was based upon the officer's personal experience. *Solether*, supra, 6th Dist. Wood No. WD-07-053, 2008-Ohio-4738, at ¶ 65.

…

The record below establishes that the state did not provide an expert report from Ottney, as required under Crim.R. 16(K). A trial court may not permit expert testimony in a criminal case without the state's provision of an expert report. Consequently, we conclude that the trial court erred in allowing Ottney to provide expert testimony concerning delayed disclosure of sexual abuse at trial.

*State v. Alliman,* 2023-Ohio-2617, 13(6th Dist.). The Ohio Supreme Court acknowledged that the amendment to Crim R 16(K) requiring that expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial was necessitated by the refusal of trial courts to apply the Crim.R. 16(K) sanction of automatic exclusion of the expert-witness testimony when the rule was violated,

Before *Boaston*, many trial courts did not apply the Crim.R. 16(K) sanction of automatic exclusion of the expert-witness testimony when the rule was violated. *See Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, at ¶ 51. Instead, they invoked Crim.R. 16(L)(1), which provides trial courts with the authority to "make orders regulating discovery not inconsistent with [that] rule." *Boaston* at ¶ 53. In the case of a discovery

violation, some courts read that provision to allow them to tailor a remedy

"as it deems[ed] just under the circumstances," Crim.R. 16(L)(1); see

*Boaston* at ¶ 53. In *Boaston*, this court held that Crim.R. 16(K) removed that

discretion. *Boaston* at ¶ 54-55.

*State v. Bellamy,* 2022-Ohio-3698, ¶7.

**{¶70}** We find nothing contained in Robertson's SANE intake forms provides any

expert opinion, analysis or conclusions concerning delayed disclosure in child sexual

abuse cases. Further, an expert cannot testify that child sexual abuse victims rarely lie

about being abused. *See, State v. Boston*, 46 Ohio St.3d 108 (1989), syllabus; *State v.

Stowers,* 81 Ohio St.3d 260, 262(1998); *State v. Elam,* 2016-Ohio-5619, ¶59(8th Dist.).

Accordingly, the trial court erred in allowing the opinion testimony and further allowing the

admission of records that contained inadmissible opinion evidence.

**{¶71}** However, this does not end our analysis. The Ohio Supreme Court has

mandated that when we find the trial judge has erroneously admitted expert testimony,

we must consider whether the error was harmless. *State v. Boaston,* 2020-Ohio-1061,

¶58.

**{¶72}** In State *v. Harris*, 2015-Ohio-166, the Court set out the three-part analysis

to guide appellate courts in determining whether the erroneous admission of certain

evidence affected the defendant's substantial rights so as to require a new trial or whether

the admission of that evidence was harmless error under Crim.R. 52(A):

> First, it must be determined whether the defendant was prejudiced
>
> by the error, i.e., whether the error had an impact on the verdict. [*Morris*],
>
> [2014-Ohio-5052] at ¶ 25 and 27. Second, it must be determined whether

the error was not harmless beyond a reasonable doubt. Id. at ¶ 28. Lastly,

once the prejudicial evidence is excised, the remaining evidence is weighed

to determine whether it establishes the defendant's guilt beyond a

reasonable doubt. Id. at ¶ 29, 33.

*State v. Harris*, 2015-Ohio-166, ¶ 37; *see also State v. Arnold*, 2016-Ohio-1595, ¶ 50

(plurality opinion); *State v. Boaston* at ¶63.

**{¶73}** Applying that analysis here, we first fail to see how Brook was prejudiced

by the admission of this evidence. Both S.B. and J.H. testified and told the jury why she

did not disclose the abuse immediately. S.B. testified that she was afraid of Brook who

had told her that her punishment "would be 100 times worse once he got out of prison.

That's his exact words." 2T. at 477-478. J.H. told the jury she was confused about what

was happening and afraid of how her family would react. 2T. at 517-518; 527; 541-542.

Because each girl testified, the jury was able to judge for themselves the girls' appearance

on the stand, manner of testifying, the reasonableness of their testimony, the accuracy of

memory, frankness or lack of it, and any bias each girl may have. 4T. at 783-784.

**{¶74}** In any event, taking away Robertson's testimony and the

"Pediatric/Adolescent Scheduled Exam Discharge Instructions" the remaining evidence

overwhelmingly establishes Brook's guilt beyond any reasonable doubt.[4]

**{¶75}** The jury heard S.B. and J.H. testify in detail to the abuse Brook inflicted

upon each girl. Details were given as to the place, time of year and what was done or

what Brook asked them to do. The jury heard the testimony of each girl corroborated in

many parts by the testimony of the other. The jury heard how each girl's story never

---

[4] We note Brook has not challenged the sufficiency or weight of the evidence related to his convictions concerning to S.B. on Count 1 and Count 3, and concerning J.H. on Counts 5, 6 and 7.

wavered regardless of who they spoke to about the incidents. The jury heard Brook's interview with Children Services.

**{¶76}** After applying the harmless-error analysis, we conclude that the improper admission of Robertson's testimony and the Pediatric/Adolescent Scheduled Exam Discharge Instructions did not affect the substantial rights of Brook. The remaining evidence adduced by the state established his guilt beyond any reasonable doubt.

**{¶77}** Brook's Third Assignment of Error is overruled.

IV.

**{¶78}** In his Fourth Assignment of Error, Brook contends that the trial judge erred in allowing the Children Services investigator Jolene Zehner, to testify to detailed allegations made by S.B. and J.H. during forensic interviews at the police station that occurred after the initial disclosures. Brook concedes that he did not object to the testimony; therefore, we review his contention only for plain error.

**Standard of Review**

**{¶79}** "To establish plain error, [Brook] must show that an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, *quoting State v. Rogers*, 2015-Ohio-2459, ¶ 22. *Accord State v. Bailey*, 2022-Ohio-4407, ¶ 8. These elements are "conjunctive," meaning "all three must apply to justify an appellate court's intervention." *Bailey* at ¶ 9, *citing State v. Barnes,* 94 Ohio St.3d 21, 27(2002). Intervention by an appellate court for plain error "is warranted only under exceptional circumstances to prevent injustice." Id. at ¶ 8, *citing State v. Long*, 53 Ohio St.2d 91(1978), paragraph three of the syllabus.

**{¶80}** The main distinction between plain-error review, which is the standard employed when a defendant failed to object at trial, and harmless-error review, which is employed when a defendant did object, is the party that bears the burden. *See State v. Jones*, 2020-Ohio-3051, ¶ 17-18. Under plain-error review, the defendant bears the burden to demonstrate the requirements for review whereas under harmless-error review, the state bears the burden to demonstrate that the error did not affect the defendant's substantial rights. Id. at ¶ 17-18. *See, State v. Bond*, 2022-Ohio-4150, ¶7.

**{¶81}** In order to show that an error affected substantial rights, the defendant must demonstrate "a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis deleted.) *State v. Rogers*, 2015-Ohio-2459, ¶ 22, *citing United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, (2004) (construing Fed.R.Crim.P. 52(b), the federal analog to Crim.R. 52(B)). *Bond* at ¶ 22.

**{¶82}** The Court in *Rogers* reaffirmed that even if an accused shows the trial court committed plain error affecting the outcome of the proceeding, the appellate court is not required to correct it. Id. at ¶ 23. The Supreme Court stated:

> [W]e have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at 27, 94 Ohio St.3d 21, 759 N.E.2d 1240, *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Rogers*, ¶ 23; *Accord, State v. Perry*, 101 Ohio St.3d 118, 120 (2004).

**Issue for Appellate Review:** *Whether but for the admission of Zehner's testimony detailing allegations made by S.B. and J.H. during forensic interviews at the police station that occurred after the initial disclosures, the jury would have acquitted Brook*

{¶83} Zehner testified that she conducted an interview with S.B. at the school on November 30, 2021. 3T. at 700. Zehner also conducted interviews with S.B. and J.H. at the Bellville police station with Lt. Fletcher present on December 7, 2021. 3T. at 712. Zehner explained that it is better for her to do the interview rather than Lt. Fletcher because, "Children tend to do better when we kind of meet them on their level. So, you know, I am in plain clothes. He is in uniform. He also has a vest and a gun, and they can be intimidating. So, we don't – law enforcement doesn't do child interviews normally." Id. at 715. After S.B. disclosed the incident where Brook took her to a hotel, Zehner directed Lt. Fletcher, "through [her] deductive reasoning" to obtain verification from the hotel. Id. at 719. She did so, "because we needed confirmation they were there." Id. Nowhere in the testimony do we find any statement by Zehner that she was seeking information from the girls to aid in their diagnoses and medical treatment, but, rather to establish a safety plan. 3T. at 696.

{¶84} In *State v. Arnold*, 2010-Ohio-2742, the Ohio Supreme Court considered the admissibility of statements made during interviews at child-advocacy centers. *Arnold* involved a Confrontation Clause challenge. The issue in *Arnold* was whether a child's statements during an interview were for medical diagnosis or treatment, making them "non-testimonial," or whether they primarily served a forensic or investigative purpose, making them "testimonial" in violation of the defendant's confrontation rights.

**{¶85}** The Supreme Court first noted that child-advocacy centers are unique insofar as a single interview with a child serves "dual purposes," which are: "(1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶ 33. The majority then turned to the substance of the child's interview. It reasoned that some of the child's statements primarily had a forensic or investigative purpose. They included the child's assertion that the defendant had "shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." Id. at ¶ 34. The Ohio Supreme Court reasoned that "[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." Id.

**{¶86}** The *Arnold* Court also found, however, that "other statements provided information that was necessary to diagnose and medically treat" the child victim. Id. at ¶ 37. It noted that "[t]he history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a 'head to toe' examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse." Id. In particular, the Ohio Supreme Court held that the following statements by the victim during the interview were necessary for medical diagnosis or treatment: "statements that described the acts that Arnold performed, including that

Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee.'" Id. at ¶ 38. The fact that the victim already had undergone a "rape-kit examination" did not dissuade the majority from finding that the foregoing statements were necessary for subsequent medical diagnosis or treatment. Id. at ¶ 39. The majority also found nothing objectionable about considering the child's statements individually to determine which ones were for medical diagnosis or treatment and to exclude those that were not. Id. at ¶ 42. Finally, the Ohio Supreme Court found nothing objectionable about the fact that police watched the interview or the fact that information obtained for medical purposes ultimately was used to prosecute the defendant. These considerations did "not change the fact" that some of the child's statements "were made for medical diagnosis and treatment." Id. at ¶ 43.

{¶87} Thus, it certainly appears that the Supreme Court in *Arnold* intermingled the confrontation and hearsay concerns of statements made by a sexual abuse victim during a forensic interview conducted by child-advocacy centers by finding the statements "were made for medical diagnosis and treatment" pursuant to Evid. 803(4) and therefore did not violate the confrontation clause.

{¶88} Accordingly, the only evidence from the girls' statements to Zehner that would even have fit within the *Arnold* exception would be the evidence related to these incidents of sexual conduct or sexual contact. The fact that abuse occurred at a hotel, what the individuals were wearing at the time, where the other adults or sibling were at the time, what was said during the encounters; and whether the victim was crying were not necessary for medical diagnosis or treatment. Rather, they related primarily to the

state's investigation. *Arnold,* ¶ 34. However, because Brook did not object we must consider whether the error was harmless. *State v. Boaston,* 2020-Ohio-1061, ¶58.

{¶89} After applying the harmless-error analysis, we conclude that the improper admission of the girls' statements to Zehner did not affect the substantial rights of Brook. The girls were not of tender years. Each girl testified and could be cross-examined concerning her interactions with Zehner. Further, the testimony was cumulative to what the girls had already testified to during the trial. Finally, we find that the remaining evidence adduced by the state established Brook's guilt beyond any reasonable doubt.

{¶90} We find that Brook has not demonstrated that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial. We decline to find a manifest injustice warranting the extraordinary step of finding plain error in the admission of Zehner's testimony.

{¶91} Brook's Fourth Assignment of Error is overruled.

{¶92} The judgment of the Richland County Court of Common Pleas is affirmed.

By Gwin, J.,

Delaney, P.J., and

Wise, J., concur