[Cite as *State v. Hughes*, 2025-Ohio-1534.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff - Appellee | : | Hon. Robert G. Montgomery, J. |
| | : | Hon. David M. Gormley, J. |
| -vs- | : | |
| | : | |
| STEPHEN R. HUGHES | : | Case No. 2024 CA 0016 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Richland County
Court of Common Pleas Case No.
2023 CR 365

JUDGMENT:     Affirmed

DATE OF JUDGMENT:     April 30, 2025

APPEARANCES:

For Plaintiff-Appellee

Michelle A. Fink
Assistant Prosecuting Attorney
38 South Park Street
Mansfield, Ohio 44902

For Defendant-Appellant

William T. Cramer
1554 Polaris Parkway, Suite 325
Columbus, Ohio 43240

*Gormley, J.*

**{¶1}** Defendant Stephen Hughes appeals his convictions following a jury trial in the Richland County Court of Common Pleas on multiple rape and gross-sexual-imposition charges. Hughes argues that the trial court erred when it permitted the jury to hear allegedly improper testimony from several of the state's witnesses, and he alleges, too, that the trial judge instructed the jury on topics that Hughes claims were prejudicial and irrelevant. For the reasons explained below, we affirm Hughes's convictions.

## Facts and Procedural History

**{¶2}** In May 2023, Hughes was indicted on three counts of rape and three counts of gross sexual imposition. According to the indictment, Hughes committed those crimes during a one-year period running from December 2020 through November 2021. The alleged victims — E.M., V.S., and B.D. — were all less than ten years of age at the time of the charged offenses.

**{¶3}** E.M., V.S., and B.D. are the daughters of Melissa Emler. Once E.M. — the eldest child — was born, Melissa often left E.M. in the care of her friend, Isis Eaton. There were times, however, when Melissa would leave all three children in the care of other individuals. Some of those individuals included Stonie Butler — Hughes's brother — and Butler's girlfriend, Emily Lee. Hughes testified at the trial that he was living in Butler's house from March 2021 until July 2021, and on at least one occasion during that time, Melissa left all three children at the house for several days in the care of Butler and Lee.

**{¶4}** E.M., who was nine years old at the time of the trial in 2024, was the only victim who testified. At trial, E.M. described the layout of Stonie Butler's house and identified — with the help of photographs taken by a Richland County Children Services

(RCCS) case worker — several items that she and her sisters owned or used while at the house. E.M. identified the upstairs bedroom where she and her sisters would stay and also identified Hughes's bedroom, which E.M. testified was just down the hall from the bedroom where she and her sisters slept. Though she did not recall the exact month and year, E.M. testified that she had stayed in the house — and the sexual abuse at issue in the case occurred — around the time when Easter would be celebrated or perhaps during the summer season.

**{¶5}** E.M. testified that Hughes licked her vagina, put his penis in her mouth, and put his penis on her vagina. E.M. also testified that she witnessed Hughes do these same things to her sisters, V.S. and B.D. E.M. further testified that Hughes took photos of her and her sisters' vaginas, forced her to "watch naked people" on television, and told her to drink something "yellow" that burned her throat.

**{¶6}** At trial, Isis — the mother's friend — testified that after E.M. had been out of her care for some period of time, she had resumed caring for E.M. by April of 2022. In May 2022, the rest of Melissa's children were removed from Melissa's care by RCCS for an unrelated incident. The three girls were placed with Isis and Isis's wife, Sommer Eaton. Shortly after the children were placed in Isis's home, E.M. and V.S. began exhibiting inappropriate sexual behavior.

**{¶7}** Both Isis and Sommer testified at the trial about a time in May 2022 when E.M. placed her vagina over a boy's mouth and put her mouth toward that boy's penis. When E.M. was questioned by Isis and Sommer about where she learned that behavior, E.M. said — according to Isis and Sommer's trial testimony — that she had learned it from Hughes.

**{¶8}** Isis also testified that one of the younger girls — V.S. — would strip her baby dolls and make them touch each other's private parts and put their mouths on each other's private parts. When asked by Isis and Sommer where she learned that behavior, V.S. said — according to Isis's trial testimony — it was taught to her "by her friend Stephen and [Stonie Butler]." Sommer also testified about a time when V.S. removed the diaper of Isis and Sommer's young son and put that boy's penis in her mouth.

**{¶9}** Isis and Sommer reported their observations and described their conversations with the girls to RCCS case worker Sarah Sharp. At Sharp's direction, E.M., V.S., and B.D. were medically evaluated in June 2022 by Sheree Ford, a sexual-assault nurse examiner. Ford testified at trial and read to the jury the written statement that E.M. had provided to her during that examination.

**{¶10}** Hughes testified in his own defense at the trial and denied the sexual-abuse allegations. Hughes was convicted on all six counts at his jury trial. He now appeals.

## Standards of Review

**{¶11}** Ohio law recognizes a distinction between alleged errors to which a defendant objects at trial and those that he or she fails to raise then. *State v. Jones*, 2020-Ohio-3051, ¶ 17. "When the defendant forfeits the right to assert an error on appeal by failing to bring it to the trial court's attention in the first instance, an appellate court applies plain-error review." *Id.*, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 21-22; *see also* Crim.R. 52(B). Under a plain-error review, the defendant bears the burden of "'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *Id.*, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16. A reviewing court should "notice

plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), quoting *State v. Long*, 53 Ohio St.2d 91, 97 (1978).

{¶12} And even when a timely objection has been made by a criminal defendant, Crim.R. 52(A) tells us that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under that rule, two questions must be answered. *State v. Fisher*, 2003-Ohio-2761, ¶ 7. The reviewing court must first determine whether there was an error, "i.e., a 'deviation from the legal rule.'" *Id.*, quoting *United States v. Olano*, 507 U.S. 725, 732–733 (1993). "Second, the reviewing court must engage in a specific analysis of the trial court record—a so-called 'harmless error' inquiry—to determine whether the error 'affect[ed] substantial rights' of the criminal defendant." (Bracketed text in original.) *Id.*

{¶13} That second step — the harmless-error test — is used when a defendant has objected at trial. *Jones* at ¶ 18. Under it, the state "'bears the burden of demonstrating that the error did not affect the substantial rights of the defendant.'" *Id.*, quoting *State v. Perry*, 2004-Ohio-297, ¶ 15. "Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *Id.*, citing *Fisher* at ¶ 7.

{¶14} And even if the improper admission of evidence affected the outcome, a reviewing court must consider too whether all of the other evidence nonetheless would have established the defendant's guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37.

## Admission of Out-of-Court Statements by E.M. and V.S.

{¶15} Hughes argues that the trial court erred by admitting — through the testimony of Isis and Sommer Eaton — hearsay statements of E.M. and V.S. as prior consistent statements under Evid.R. 801(D)(1)(b). Because Hughes objected to the admission of the statements of both E.M. and V.S., we review the trial court's action under the harmless-error standard. This requires us to first determine if the admission of the statements of each girl was an error under Evid.R. 801(D)(1)(b). If we do find an error, we turn next to whether the error prejudiced Hughes.

{¶16} Hearsay is of course an out-of-court statement that is offered as evidence to prove the truth of the matter asserted in the statement. Evid.R. 801(C). Hearsay statements are usually inadmissible at trial unless an exception applies. Evid.R. 802. An out-of-court statement is not hearsay if several things are all true: the declarant testifies at the trial, that person is subject to cross examination concerning the statement, and the statement is "consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive." Evid.R. 801(D)(1)(b).

{¶17} The decision to admit or exclude evidence lies in the trial court's sound discretion. *State v. Crawford*, 2008-Ohio-6260, ¶ 54 (5th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. In deciding whether to admit a prior consistent statement for rebuttal purposes, a trial court "should take a generous view of the entire trial setting to determine if there was sufficient impeachment of the witness to amount to a charge of fabrication or improper influence or motivation." *State v. Smith*, 2010-Ohio-1721, ¶ 103 (12th Dist.). This court has held that Evid.R. 801(D)(1)(b) may

be used to introduce prior consistent statements when defense counsel has attacked a witness's credibility in defense counsel's opening statement. *State v. Scheeler*, 2023-Ohio-1130, ¶ 81 (5th Dist.); *accord Crawford*, 2008-Ohio-6260 at ¶ 64 (5th Dist.).

*Prior Statements of E.M.*

**{¶18}** Isis and Sommer Eaton both testified at the trial about an incident in 2022 during which E.M. exhibited inappropriate sexual behavior, which prompted them at the time to question her about her conduct. The trial court permitted both Isis and Sommer to testify to E.M.'s explanation in 2022 that she had learned the behavior from Hughes. Both Isis and Sommer then testified about specific details E.M. had given them about prior sexual abuse by Hughes.

**{¶19}** Hughes's defense counsel, in his opening statement, told the jury that it was going to be "very clear" that the state's case was "fraught with inconsistencies" involving E.M.'s past disclosure of abuse. Hughes's defense counsel then went on in his opening to suggest that some persons suspected as early as 2019 that E.M. may have been victimized, but it wasn't until E.M. had been "questioned by adult after adult after adult" and "several years later" that there started to be "inconsistencies" in E.M.'s statements and that she began to mention Hughes as being one of her abusers.

**{¶20}** Additionally, Hughes's defense counsel implied during cross-examination of E.M. that she had a motive to lie about her abuse because E.M.'s life had improved significantly once she began living with Isis and Sommer. Defense counsel asked E.M. during cross-examination if her life was "a very happy life" and whether her circumstances at that time were "a nice change" from the circumstance that she had endured when she was out of Isis and Sommer's care.

**{¶21}** Hughes's defense counsel again used this approach during his cross-examination of Isis Eaton. Hughes's counsel asked Isis if she and Sommer were providing things to E.M. that E.M. likely "wasn't receiving from Melissa." Hughes's counsel — to support his point — mentioned Isis's earlier testimony that she provided E.M. with nice toys and basic love and affection.

**{¶22}** After reviewing that full record, we find that the admission of E.M.'s prior out-of-court statements to Isis and Sommer was — in light of Evid.R. 801(D)(1)(b) — not an error. E.M. herself did testify during the trial, and she was cross-examined by Hughes's attorney. That attorney had attacked E.M.'s credibility during opening statements, and he also implied during his cross examination of multiple witnesses — including E.M. — that E.M.'s improved living situation provided a motive for E.M. to testify that Hughes was her abuser so that she could continue living with Isis and Sommer.

**{¶23}** We note, too, that any alleged improper motive had not yet arisen when E.M. made the statements in 2022. Though E.M. reportedly made the statements soon after Isis and Sommer were granted kinship custody of her, the jury heard that E.M. would not have known then about any possibility that Isis and Sommer could later be granted permanent custody of her.

**{¶24}** We find that the attack on E.M.'s credibility during opening statements and the implication that she had a motive to fabricate her testimony to continue living with Isis and Sommer were sufficient to allow the state to introduce E.M.'s prior consistent statements under Evid.R. 801(D)(1)(b).

**{¶25}** We are also unpersuaded by Hughes's argument that no specific event or motive to fabricate had been shown by the state. It was Hughes's defense counsel who

implied during both his opening statement and his cross-examination of E.M. that she had a motive to lie about her abuse so that she could continue living with Isis and Sommer. We find that the trial judge properly determined that after E.M. testified, her prior out-of-court statements could be introduced as prior consistent statements under Evid.R. 801(D)(1)(b).

*Prior Statements of V.S.*

**{¶26}** Isis testified that she observed V.S. strip her baby dolls and make them touch each other's genitals and put their mouths on each other's genitals. Isis further testified that when she asked V.S. who taught her that behavior, V.S. told Isis that she learned it from "her friend Stephen [Hughes] and [Stonie Butler]."

**{¶27}** V.S. herself did not testify during the trial and was not subject to cross-examination, and the admission of her out-of-court statement was not proper under any hearsay exception. We conclude, however, that the erroneous admission of V.S.'s statement did not affect Hughes's substantial rights because the error was harmless.

**{¶28}** "'The erroneous admission of hearsay evidence is harmless if additional information, separate and apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove.'" *State v. Patterson*, 2003-Ohio-4673, ¶ 49 (5th Dist.), quoting *In re Reeves*, 2000 WL 727532, *20 (9th Dist. June 7, 2000).

**{¶29}** V.S.'s statement was presumably offered by the state to show that Hughes sexually abused V.S. by putting his penis in her mouth and licking her vagina, which was a learned behavior that V.S. later emulated with her dolls. On direct-examination, V.S.'s elder sister E.M. testified that she witnessed Hughes sexually abuse V.S. and B.D.

Specifically, E.M. testified that she saw Hughes abuse V.S. by putting "his private parts in her mouth" and "lick[ing] her vagina."

**{¶30}** E.M.'s testimony on that issue was certainly admissible, and it addressed the same information that V.S. had reportedly told Isis. The erroneous admission of V.S.'s hearsay statement was, therefore, a harmless error that did not prejudice Hughes.

**{¶31}** For the reasons explained above, Hughes's first assignment of error is overruled.

## Expert-Witness Testimony That Children Rarely Lie About Sexual Abuse

**{¶32}** In his second assignment of error, Hughes argues that the trial court erred by permitting Sheree Ford and Dawn Couts to testify that children rarely lie about sexual abuse.

**{¶33}** We have held that an expert witness cannot offer that kind of opinion. *State v. Brook*, 2024-Ohio-3074, ¶ 70 (5th Dist.). We find that the trial court in this case erred when it allowed Couts and Ford to testify that children rarely lie about sexual abuse. Our analysis, however, does not end there. We must next determine whether Hughes was prejudiced by these errors.

### *Testimony of Sheree Ford*

**{¶34}** Ford testified during the trial that it was her opinion — based on her education and training as a sexual-assault nurse examiner — that it is not common for children to lie about sexual abuse and that false allegations of sexual abuse by a child victim are very rare. Hughes objected at trial, so we review the admission of Ford's erroneous opinion testimony under a harmless-error standard.

**{¶35}** In our decision in *Brook* last year, we found that a trial judge erred by allowing the admission of a medical-examination report that contained the statement "[c]hildren rarely lie about sexual abuse." *Brook* at ¶ 63, 76. We determined, however, that the error was harmless because the victims in that case testified about their abuse at the trial, and the evidence presented by the prosecution established the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 76. When a child victim testifies, the jurors are able to judge for themselves the victim's "appearance on the stand, manner of testifying, the reasonableness of their testimony, the accuracy of memory, frankness or lack of it, and any bias [the victim] may have." *Id.* at ¶ 73.

**{¶36}** Applying the *Harris* harmless-error analysis here, we do not find that Hughes was prejudiced by the admission of Ford's opinion. Though we are troubled that the trial court permitted Ford to testify over Hughes's objection that children rarely lie about sexual abuse, we do not find that this error had an impact on the verdict. E.M. testified that she understood the difference between the truth and a lie and provided an example of when a statement would be a lie instead of the truth. The jurors were able to determine for themselves if E.M. was lying about her abuse by independently observing E.M.'s appearance on the stand, her manner of testifying, the reasonableness of her testimony, the accuracy of her memory, and her frankness or lack of it, and those jurors could also evaluate any bias against Hughes that may have motivated E.M. to testify as she did.

**{¶37}** We also find that regardless of the impact of the erroneous admission of Ford's opinion about the truthfulness of children, the remaining evidence established Hughes's guilt beyond a reasonable doubt. E.M. testified in great detail about the abuse

that Hughes inflicted on her and her sisters. E.M. testified that Hughes would lick their vaginas and put his penis into their mouths. She also testified that Hughes's penis looked like a "tissue" before he put it into one of their mouths, but other times, it was "straight" and "looked like a marker."

**{¶38}** E.M. identified for the jury — in several photographs taken by RCCS that were introduced at trial — items that belonged to her and her sisters that were located by a case worker in the house where E.M. said that the abuse had occurred. Further, Hughes's own testimony corroborates that he was living in the house when E.M. and her sisters were staying there. And Isis and Sommer Eaton testified about the girls exhibiting sexually charged behavior that is not common in children of such a young age. Further, E.M.'s first-grade teacher, Dawn Couts, testified that E.M. behaved in a manner that could be indicative of sexual abuse, such as licking the bathroom floor and crawling under bathroom stalls to look at other children. Couts testified about one particular time when E.M. used a pen or marker to draw a pair of eyes on her own hand and then had used that hand to simulate oral sex.

**{¶39}** In light of this extensive evidence, we conclude that Ford's testimony that children rarely lie about sexual abuse did not swing the verdict and was harmless.

**{¶40}** In support of his contrary view here, Hughes argues that Ford's testimony was particularly prejudicial because this case was a "credibility contest" with no physical evidence or corroborating witnesses to support the claims of sexual abuse. We find this argument unconvincing.

**{¶41}** Circumstantial evidence holds the same probative value as direct evidence. *State v. Johnson*, 2022-Ohio-4344, ¶ 127 (5th Dist.), citing *State v. Jenks*, 61 Ohio St.3d

259 (1991), paragraph one of the syllabus. A jury is free to accept or reject all or part of the evidence offered by the parties. *State v. McGregor*, 2016-Ohio-3082, ¶ 10 (5th Dist.). As explained above, there was ample evidence presented to the jurors for them to make their own determinations about E.M.'s credibility, Hughes's credibility, and the strength of the state's case as a whole. We do not find that Ford's opinion testimony was so compelling as to be outcome determinative in light of all the other evidence in the case.

*Testimony of Dawn Couts*

**{¶42}** E.M.'s first-grade teacher, Dawn Couts, testified that through the course of her continuing education as a teacher, she learned that "children rarely lie about sexual abuse." Hughes's trial counsel failed to object to this improper testimony during trial, so we are left with only plain-error review.

**{¶43}** When considering the evidence presented in this case, we do not find that Hughes has met his burden of showing that the outcome of his trial would have been otherwise absent Couts's erroneous testimony. As explained above, E.M. testified during the trial about the sexual abuse that Hughes inflicted upon her and her sisters. The jury was able to observe E.M. on the stand and determine her credibility accordingly.

**{¶44}** Hughes's second assignment of error is overruled.

**Expert-Witness Testimony Regarding Credibility of Child Victim**

**{¶45}** In his third assignment of error, Hughes argues that the trial court erred by permitting nurse Sheree Ford and psychologist Robin Tener to testify regarding E.M.'s credibility.

**{¶46}** The Supreme Court of Ohio has held that "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston*,

46 Ohio St.3d 108, 129 (1989). An expert witness is also not permitted to testify about whether a child victim fantasized their abuse. *Id.* at 128. The court reasoned that it is the judge or jury as fact finder, not the expert witness, who "'bears the burden of assessing the credibility and veracity of witnesses.'" *Id.* at 129, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988) (Holmes, J., concurring).

**{¶47}** Our court, however, has found that a *Boston* error may be harmless where the child victim testifies about the abuse and is subject to cross-examination during the trial. *State v. Harvey*, 2014-Ohio-2683, ¶ 16 (5th Dist.) ("*Boston* does not apply . . . when the jury hears testimony about the abuse from the victim"); *State v. Hill*, 2010-Ohio-4295, ¶ 48 (5th Dist.) ("even if we were to find that the trial court erred in admitting [the expert's] testimony, we find that such error would be harmless in that the jury heard testimony about the abuse from the victim, which was corroborated by the testimony of [three other witnesses]").

**{¶48}** While we find that the trial court did err by permitting Ford and Tener to testify regarding E.M.'s credibility, this error does not automatically warrant a new trial. We must analyze whether Hughes was prejudiced by these errors.

*Testimony of Sheree Ford*

**{¶49}** Because Hughes objected to nurse-examiner Ford's testimony at trial, our review is for harmless error. Ford testified about her discussion with and physical examination of E.M. and the other two girls in June 2022, and Ford said in her trial testimony that she found the June 2022 statements of E.M. to be credible. Ford explained the manner in which E.M. told her story, noting that E.M. would "act out" the things that

happened to her, such as "bobbing her head up and down" when discussing how Hughes would put his penis into her mouth.

{¶50} Though it was improper for Ford to testify that she found E.M. to be "credible," it was not improper for Ford to testify about the behavior she observed in E.M. as E.M. described her interactions with Hughes. The rule of law established in *Boston* "does not proscribe testimony [that provides] additional support for the truth of the *facts testified to* by the child, or . . . assists the fact finder in assessing the child's veracity." (Emphasis in original.) *State v. Stowers*, 81 Ohio St.3d 260, 263 (1998). The only error in Ford's testimony, therefore, was her statement that she found E.M. to be credible.

{¶51} Though we are troubled that the trial court allowed Ford to offer an opinion about E.M.'s credibility, we do not find that this error had an impact on the verdict. Notably, Hughes's trial counsel — during cross-examination of Ford — asked the nurse to agree that "[her] job is not to come to an opinion about whether or not people are telling the truth." Ford confirmed that it is not her job to tell if someone is being truthful, and she added that her job is to provide medical treatment.

{¶52} Further, the trial judge's final instructions to the jury before the start of deliberations rightly emphasized that the members of the jury were "the sole judges of the facts and the weight of the evidence" and that in weighing the evidence, the jury "must consider the credibility of the witnesses." The judge further instructed the jurors that they were not "required to believe the testimony of any witness simply because he or she was under oath."

**{¶53}** And again, as explained in detail above, the jurors were able to assess for themselves the credibility of E.M. E.M. was cross-examined by Hughes's trial counsel, and the jurors were free to reject all or any part of her testimony.

**{¶54}** We do not find that Ford's opinion about E.M.'s credibility was outcome determinative, and we conclude that the erroneous admission of it was harmless beyond a reasonable doubt in light of E.M.'s testimony. The remaining evidence established Hughes's guilt beyond a reasonable doubt.

*Testimony of Robin Tener*

**{¶55}** Hughes argues that the trial court erred in permitting psychologist Tener to testify that she did not see any fantasy explanations from E.M. when Tener watched a video recording of nurse Ford's forensic interview of E.M. and read various law-enforcement and medical records about the alleged crimes. We review this issue solely for plain error because Hughes did not object to Tener's testimony at trial.

**{¶56}** We find here, too, that Hughes has failed to demonstrate that the outcome of his trial would have been different absent Tener's testimony that E.M. did not appear to have fantasized her abuse. As explained above in our discussion about nurse Ford's testimony, Tener was properly permitted to testify about the behavior she observed in E.M. that indicated that E.M. had been a victim of sexual abuse. And on cross-examination, Tener acknowledged that she was "not providing opinions regarding the ultimate truth of the fact. That's what [the jury is] here for." The jury also heard from E.M. herself, who told the jury under oath about the abuse that Hughes inflicted on her and her sisters. The jury was then free to believe or disbelieve E.M.

**{¶57}** We do not find that this is a case where reversal is necessary given that we see no manifest miscarriage of justice flowing from Tener's testimony. Hughes's third assignment of error is overruled.

## Irrelevant Jury Instructions

**{¶58}** In his fourth assignment of error, Hughes contends that he was prejudiced by the inclusion of definitions in the jury instructions that were not at issue in his trial. Hughes argues that the court erred by including the definition of "force" in the instruction for the three rape charges involving each of the three children. Hughes also criticizes the wording of the instructions for the three gross sexual imposition charges, and he questions the inclusion of the definition of "surreptitiously" and an admonition relating to the touching of another's genitalia. Hughes failed to object to the jury instructions at trial, though, so our review focuses solely on any plain error.

**{¶59}** "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). An erroneous jury instruction does not constitute plain error unless "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Cooperrider*, 4 Ohio St.3d 226, 227 (1983), citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus.

**{¶60}** "An unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 35. "If the complete set of instructions by the trial court otherwise fairly and correctly lays out the relevant law, and if it is apparent in the

context of the complete instructions that an isolated error did not prejudice a party's substantial rights, reversal on the error is not warranted." *Id.*, citing *Centrello v. Basky*, 164 Ohio St. 41 (1955), paragraph eight of the syllabus.

{¶61} After reviewing all of the jury instructions, we find that they accurately set forth the elements for rape, in violation of R.C. 2907.02(A)(1)(b) (sexual conduct with a person under age 13), and gross sexual imposition, in violation of R.C. 2907.05(A)(4) (sexual contact with a person under age 13). We do note, however, that there were definitions included in the instructions that were irrelevant to those charged offenses. When providing the jury instructions for rape, the judge included the definitions of "force" and "resistance," which are terms included in a different subsection that Hughes was not charged under. Similarly, when providing the jury instructions for gross sexual imposition, the judge included language that was relevant only to R.C. 2907.05(B) (knowingly touching the genitalia of a person under age 12 with an intent to abuse or arouse), as well as the definition of "surreptitiously," which, again, was not relevant to the subsection under which Hughes was charged.

{¶62} As we are reminded by the editors of Ohio Jury Instructions — a collection of non-binding model instructions prepared by the Ohio Judicial Conference's Ohio Jury Instructions Committee — "[n]o instruction should be given unless it is both necessary and applicable to the fact situation at hand." *Ohio Jury Instructions*, CR § 101.69 (Rev. Dec. 1, 2007). Despite the trial judge's improper inclusion of definitions that were not elements of Hughes's charges, Hughes has failed to meet his burden of demonstrating that he would have been acquitted if those definitions had been omitted.

The jury instructions otherwise fairly and correctly set forth the elements of the rape and gross-sexual-imposition charges that were at issue in the case.

**{¶63}** Because we do not find that the inclusion of irrelevant jury instructions changed the verdicts, Hughes's fourth assignment of error is overruled.

**Cumulative Error Deprived Appellant of Fair Trial**

**{¶64}** In his fifth assignment of error, Hughes argues that what he describes as cumulative errors deprived him of a fair trial.

**{¶65}** The doctrine of cumulative error provides that "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of harmless errors.'" *State v. Stober*, 2014-Ohio-5629, ¶ 15 (3d Dist.), quoting *In re J.M.,* 2012-Ohio-1467, ¶ 36 (3d Dist.).

**{¶66}** As detailed above, we have found multiple instances of error at Hughes's trial, each of which were insufficient to warrant reversal of his convictions. These errors included the admission of V.S.'s out-of-court statements as prior consistent statements, testimony from two witnesses that children rarely lie about sexual abuse, testimony that E.M. was credible, and irrelevant definitions in the jury instructions. We do not find, though, a reasonable probability that absent all of these errors, the outcome of Hughes's trial would have been different.

**{¶67}** As we have discussed above, E.M. testified during the trial about Hughes's sexual conduct with E.M. and her two sisters. E.M.'s testimony was detailed and was consistent with the previous out-of-court statements that she had provided to Sheree Ford, Isis Eaton, and Sommer Eaton. The jury was able to weigh E.M.'s credibility and evaluate the strength of the circumstantial evidence that supported it. Additionally, Hughes took the stand in his own defense, which gave the jury an opportunity to weigh his credibility too.

**{¶68}** Further, several adults testified about behavior that was observed in E.M. and V.S. that indicated the girls had been sexually abused. As we earlier noted, jurors heard E.M.'s first-grade teacher, Couts, testify that E.M. would lick the bathroom floors and crawl underneath bathroom stalls to watch other children in the bathroom. Couts also testified about an incident where E.M. used a drawing on her hand to simulate oral sex.

**{¶69}** Jurors also heard that V.S. was observed stripping her baby dolls and making them touch in a sexual manner, and that V.S. removed the diaper of another child and put that child's penis in her mouth. Isis and Sommer testified, too, about seeing E.M. engage in similar sexually charged behavior, such as placing her vaginal area over another child's mouth and placing her mouth near that child's penis.

**{¶70}** Even considering the collective impact of the errors, we do not find that they were so prejudicial as to deprive Hughes of a fair trial. In light of the properly admitted evidence, we see no reasonable probability that the errors altered the outcome of the trial. Hughes's fifth assignment of error is overruled.

**{¶71}** For the reasons explained above, we affirm the judgment of the trial court.

By: Gormley, J.

Baldwin, P.J. and

Montgomery, J. concur.